Argued and submitted January 13; decision of Court of Appeals reversed, judgment of circuit court reversed, and case remanded to circuit court for further proceedings September 3, 2020

STATE OF OREGON,
*Respondent on Review,*

*v.*

FRANCIS PAUL WEAVER,
*Petitioner on Review.*

(CC CR1400331) (CA A161899) (SC S066636)

472 P3d 717

The state entered into a plea agreement with a defense witness that prohibited the witness from testifying at defendant's trial or cooperating in any way with defendant. Defendant objected and sought to introduce the plea agreement into evidence. The trial court denied defendant's motions. Defendant was convicted of murder and other crimes, and the Court of Appeals affirmed his convictions. *Held*: (1) Defendant preserved his assignments of error; (2) the state's agreement with the defense witness violated defendant's right to compulsory process under Article I, section 11, of the Oregon Constitution; (3) the trial court's failure to remedy the violation was not harmless error; and (4) the trial court erred in holding that the plea agreement could not be admitted under OEC 513.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

En Banc

On review from the Court of Appeals.*

Neil F. Byl, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause and filed the brief for petitioner on review. Also on the brief was Ernest G. Lannet, Chief Defender.

Jennifer S. Lloyd, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

_____

* On appeal from Clackamas County Circuit Court, Michael C. Wetzel, Judge. 296 Or App 453, 439 P3d 531 (2019).

BALMER, J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.

## BALMER, J.

While defendant was awaiting trial for murder, the state entered into a plea agreement with one of his codefendants, Michael Orren—a potential witness in defendant's case. The plea agreement required Orren, if called by defendant as a witness, to invoke his privilege against self-incrimination and not to testify on defendant's behalf. If Orren complied with the agreement, the state would seek a life sentence with the possibility of parole after 30 years. However, if Orren testified for defendant, even truthfully, the state could seek a death sentence or a sentence of life without parole—two sentencing options that were otherwise taken off the table by Orren's plea agreement. Defendant attempted to call Orren as a witness, and Orren invoked privilege. Defendant sought to at least place Orren's plea agreement before the jury, but the trial court ruled that he could not. The jury found defendant guilty of murder and other crimes, and the Court of Appeals affirmed. *State v. Weaver*, 296 Or App 453, 439 P3d 531 (2019).

Before this court, defendant argues that the state's conduct interfered with his right to call witnesses under Article I, section 11, and the Sixth Amendment. The state has little to say in defense of its conduct in the trial court, but it contends that defendant failed to preserve this argument and made a showing insufficient to establish that his rights were violated. We conclude that defendant's Article I, section 11, right to compulsory process was violated.[1] Defendant's convictions must be reversed.

## I.   BACKGROUND

In the early morning of February 16, 2014, Orren shot and killed the victim. An investigation linked Orren's actions to three other conspirators: defendant, Brittany Endicott, and Shannon Bettencourt. In brief, evidence suggested that defendant had lured the victim to Canby under the pretense of purchasing from the victim a large quantity of marijuana; that defendant had conspired with

---

[1] Article I, section 11, of the Oregon Constitution provides, in part, that "[i]n all criminal prosecutions, the accused shall have the right to compulsory process for obtaining witnesses in his favor."

Orren, Bettencourt, and Endicott to rob the victim of the marijuana; and that Orren had killed the victim during the robbery. Orren was charged with aggravated murder, and the state intended to seek the death penalty. All four defendants were charged with murder, along with other offenses, including first-degree robbery. Defendant was charged with murder, two counts of first-degree robbery, conspiracy to commit first-degree robbery, second-degree robbery, conspiracy to commit second-degree robbery, and with being a felon in possession of a firearm.

For our purposes, the most important facts are procedural, so we focus on those. The evidence that was presented to the jury is ultimately relevant to our harmless error analysis, so we briefly describe the evidence at trial as well.

A.   *Pretrial Proceedings*

The cases of all four defendants were set for a joint trial. Defendant, Bettencourt, and Endicott all moved to sever the charges and to obtain trials separate from Orren. In a filing responding to that motion and addressing Sixth Amendment Confrontation Clause issues likely to arise in a joint trial (and not at issue here),[2] the state outlined its theory of the case and described statements made by Orren in police interviews. The state attached the video or audio recordings of those interviews as exhibits. In most of those statements, Orren denied any involvement in the murder, but in the final interview he admitted to shooting the victim, although he maintained that he had done so in self-defense. In that interview, Orren stated that the plan was a "smash and grab": "My involvement was literally just a smash and grab. Smash the window and grab the stuff. Nothin' more." However, Orren declined to specifically implicate or further incriminate any of the codefendants. The state also included interviews with defendant, where he similarly admitted to a planned "smash and grab," in which defendant would lure

_____

[2] *Bruton v. United States*, 391 US 123, 88 S Ct 1620, 20 L Ed 2d 476 (1968), holds that the Confrontation Clause of the Sixth Amendment to the United States Constitution requires that confessions of nontestifying codefendants be redacted to omit incriminating references to the other defendants when they are admitted in a joint trial.

the victim away from his car while Orren stole the marijuana from the vehicle.

The motion to sever was denied, but the joint trial was not to occur. First, Endicott and Bettencourt pleaded guilty to first-degree robbery. Their plea agreements contemplated the dismissal of the murder charges against them but required both of them to tell the truth if they were called to testify.

Shortly thereafter, Orren pleaded guilty to aggravated murder and first-degree robbery with a firearm. The agreement provided that the other charges against Orren would be dismissed. The plea agreement also specified that, if Orren complied with the agreement, he would receive a sentence of life with a minimum of 30 years without the possibility of parole—the lowest penalty authorized for aggravated murder. *See* ORS 163.105(1) (2015). Under the agreement, the state agreed that Orren would not receive a sentence of death or of life without the possibility of parole.

The agreement contained the following additional provisions:

"F. That Deputy District Attorneys Russell Amos, Jeremy Morrow, or their designee, will determine whether Mr. Orren has fully complied with the terms of this agreement. It is expressly understood and agreed by the parties that the determination for whether the terms have been breached rests exclusively with the mentioned deputy district attorneys or their designees, so long as that determination is made in good faith and not arbitrarily[,] to be determined by the court. Should the Clackamas County District Attorney's office determine that the defendant, after the date of the agreement, breached any condition of this agreement, the Clackamas County District Attorney's office will have the right, in its sole discretion, to void this agreement in whole or in part. Furthermore, Mr. Orren agrees that substantial compliance of this agreement is not acceptable and will be considered a breach of the agreement.

"G. The parties further agree that should the Clackamas County District Attorney's office determine that Mr. Orren breached his agreement: (1) the defendant may not withdraw his guilty pleas; (2) that the Clackamas

County District Attorney's office is free to make any sentencing recommendation and is not bound by this agreement, and (3) Mr. Orren may be prosecuted for any crime committed by him, whether or not such crime was the subject of the agreement.

"a.    More specifically, in regards to Count 1: Aggravated Murder, upon breach of this agreement the defendant will not be allowed to withdraw his plea of guilty and the case would then commence to the sentencing (penalty) phase pursuant to ORS 163.150 in which a sentencing proceeding will commence and a judge or jury will determine whether the defendant will be sentenced to death, life imprisonment without the possibility of release or parole, or life imprisonment with a minimum of 30 years in prison without the possibility of parole \*\*\*."

In effect, the plea agreement was a strict one. If Orren failed to comply with the agreement or took actions that the prosecution in good faith determined were noncompliant, then, under the terms of the agreement, Orren would face the possibility of a death sentence, or at least a presumptive sentence of life without parole. *See* ORS 163.150(2)(b) (2015) (conditioning a sentence of life with the possibility of parole on the jury finding mitigating circumstances).

The plea agreement then set forth the condition with which Orren was required to comply:

"To not testify or otherwise cooperate in any way on behalf of any of the codefendants \*\*\*. In regards to a trial, hearing, grand jury and any other proceedings involving any of the co-defendants, Mr. Orren agrees to assert his Fifth Amendment Right against self-incrimination and not to testify on behalf of any of the co-defendants."

The plain text of that condition makes clear that it was not, in contrast to the Bettencourt and Endicott agreements, simply a prohibition on *false* testimony. Although the condition applied to cooperation with all three codefendants, Bettencourt and Endicott had already entered into plea agreements, leaving defendant as the only person affected. The plea agreement prohibited Orren from offering any testimony, including truthful testimony, on defendant's behalf. In addition, it prohibited Orren from "cooperat[ing] in any

way" with defendant. The plea agreement contained the following text after that term:

> "This agreement is meant to protect the State from Mr. Orren providing untruthful and/or false testimony to include untruthful and/or false testimony about the murder and robbery of [the victim] to include, but not limited to, the specific involvement and criminal culpability of the co-defendants."

The plea agreement was signed by Orren, his attorneys, and Amos and Morrow, the two deputy district attorneys responsible for prosecuting both Orren and defendant. Orren had not been sentenced by the time of defendant's trial, over a year after Orren entered his guilty plea.[3]

Having obtained guilty pleas from three of the four codefendants, the state moved ahead to try defendant for murder and other crimes. The state's theory was that, although the victim had been killed by Orren, defendant was the leader of the conspiracy. Before trial, the state filed a motion to prohibit defendant from calling Orren as a witness and to bar defendant from introducing into evidence or making reference to Orren's plea agreement at trial. The state framed the motion by referring the court to statements that Orren had made in the interviews that the state had included with its earlier motion, including a statement that Orren did not want to be a snitch. The state attached Orren's plea agreement to the motion, and it explained that "[p]ursuant to the agreement if Mr. Orren is called as a witness in this defendant's case he would invoke his Fifth Amendment right to remain silent and not to testify." The state explained that it anticipated that defendant would call Orren to the witness stand to invoke privilege in front of the jury or that defendant would offer the plea agreement into evidence "to somehow insinuate that the State is keeping material information from" the jury.

In support of its contention that the trial court should prohibit Orren from being called as a witness, the state relied on OEC 513, which provides:

---

[3] The plea agreement appeared to contemplate such a delay, for the purpose of permitting Orren to invoke privilege at defendant's trial.

"(1)   The claim of a privilege, whether in the present proceeding or upon a prior occasion, is not a proper subject of comment by judge or counsel. No inference may be drawn from a claim of privilege.

"(2)   In jury cases, proceedings shall be conducted, to the extent practicable, so as to facilitate the making of claims of privilege without the knowledge of the jury.

"(3)   Upon request, any party against whom the jury might draw an adverse inference from a claim of privilege is entitled to an instruction that no inference may be drawn therefrom."

As to the plea agreement, the state relied on OEC 513, arguing that the agreement was irrelevant. The state also advanced an argument under OEC 403, which provides for the exclusion of evidence when

"its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

In making its OEC 403 argument, the only source of prejudice that the state identified was the possibility that the jury might incorrectly infer that the state was keeping evidence from the jury.

At a hearing on the state's motion on July 27, 2015, the trial court began by stating:

"As I read [the prosecutor's] motion, essentially he's asking for a ruling by this Court that the defense not be able to call Mr. Orren for the purpose of having him presumably invoke in front of the jury."

Defense counsel replied, "That's how I understood the motion as well, Your Honor." At that hearing, Orren's counsel appeared, and indicated that Orren would invoke his Fifth Amendment right if he were called as a witness. Defendant responded to the state's motion by arguing that the premise of the state's argument—that Orren had a Fifth Amendment privilege to invoke—was false. Relying on *State v. Barone*, 329 Or 210, 986 P2d 5 (1999), defendant argued that because Orren had already entered a guilty plea, he was no longer in jeopardy and, therefore, did not retain his

constitutional privilege against being compelled to testify. Moreover, defendant argued, Orren had specifically waived his constitutional privilege in the plea agreement.

Defendant also argued that he should be allowed to introduce Orren's plea agreement at trial. After discussing some other potential sources of relevance for the plea agreement, defendant turned to the clause requiring Orren to invoke his privilege. He prefaced that discussion, the first time that he raised the issue, with the following statement:

> "And the last thing I want to bring up, Your Honor, and this is somewhat troubling for me, based on Mr. Weaver's belief that he can't get a fair trial."

Defendant directed the court to the language in the plea agreement. He argued that,

> "in order to get his deal, the State is requiring, requiring Michael Orren to, one, not testify on behalf of defendant Weaver. The only implication there is Mr. Orren has exculpatory evidence which the State is requiring him not to provide in order to get his deal."

Defendant continued,

> "The State is not requiring Mr. Orren to tell the truth. The State is requiring Mr. Orren to be a roadblock to finding the truth. And based on that, Your Honor, Mr. Weaver should be allowed to introduce [it] into evidence, if he can't call Mr. Orren. But even if he can, in any way, shape, or form, he should be able to introduce the petition to enter a plea of guilty, the plea agreement, and the judgment and the amended judgment. And he should be able to argue any and all inferences he can come up with regarding those documents."

The state responded to defendant's argument that the plea agreement supported an inference that the state was keeping exculpatory evidence from the jury. The state began by focusing on constitutional issues:

> "And finally, [defense counsel] does a good job of saying 'exculpatory evidence' about seven, eight or nine or ten times, inferring that somehow the State is hiding evidence from Mr. Weaver. But let's just make clear on the record that the State has constitutional obligations both in the

state and federal system, and under *Brady* [*v. Maryland*,
373 US 83, 83 S Ct 1194, 10 L Ed 2d 215 (1963)], of course,
to provide any exculpatory information to the defendant,
and we have done that in this case."

After addressing defendant's argument that the plea agree-
ment indicated that the state was suppressing exculpatory
evidence, the state turned to the rules of evidence, arguing
that, for purposes of OEC 513, the plea agreement was the
equivalent of an invocation of privilege by Orren. The court
took the matter under advisement, indicating that it would
review *Barone* before making a decision.

On August 19, 2015, defendant filed a witness list
for the trial. The first name on that list was Michael Orren.
On August 31, the trial court held another hearing, at which
it addressed the two issues raised at the prior hearing. First,
it addressed "whether or not [Orren] was going to be com-
pelled to come in and testify." The court ruled that Orren
had retained his privilege against self-incrimination, and
that he therefore could not be called to testify. The court
then turned to whether defendant could introduce the plea
agreement. Rather than issue a decision at that hearing,
the court requested additional briefing from defendant on
the relevance of the plea agreement. After acknowledging
that request, defendant again argued that the plea agree-
ment required Orren to withhold exculpatory testimony. He
continued:

"And I don't see how the court can allow the state to pro-
hibit a witness to give exculpatory evidence if he wants
a—a favorable plea agreement."

Defendant agreed to file further briefing, as requested by
the court.

On October 20, defendant filed a memorandum
elaborating on why he should be allowed to offer Orren's
plea agreement into evidence. Again, defendant argued that
the plea agreement supported a permissible inference that
"Orren has exculpatory evidence which the State is requir-
ing him not to provide—to get his deal." Defendant argued
that the plea agreement was evidence of "*de facto* witness
tampering" by the state. Defendant also noted that the

state had been put on notice that defendant "intended to call Michael Orren as a witness on his behalf at his trial."

In explaining the significance of Orren's testimony, defendant laid out the defense's theory of the case:

> "Defendant claims that he was not involved in any alleged robbery and/or murder of [the victim] and that he did not know that Michael Orren was in possession of a gun and, further, that Michael Orren was going to rob and/or murder [the victim]. If believed this defense would exonerate Mr. Weaver on said charges. Erroneously preventing Mr. Weaver from offering both direct and circumstantial evidence supporting his version of the facts strikes at the heart of his defense."

Defendant then included a lengthy block quote from *State v. York*, 291 Or 535, 632 P2d 1261 (1981). In *York*, this court ruled, on subconstitutional grounds, that "a prosecutor should not improperly interfere with the effort by the defense to interview prospective witnesses by instructing them not to talk to the defense attorney or by telling them that 'it would be better if they didn't say anything.'" *Id.* at 541. In *York*, this court also emphasized that "[d]efense attorneys cannot sit on their hands, doing nothing, and later complain of the prosecutor's misconduct." *Id.* at 543. Defendant's block quote from *York* concluded with that line. He added, "Defendant Weaver is taking those steps here and now."

The trial court next took up the admissibility of Orren's plea agreement at a hearing on November 2, 2015. The state began by responding to defendant's motion. The state first argued that it had not coerced Orren, because it was Orren's decision to enter into the plea agreement. The state further argued that evidence that the "state forced him to assert his Fifth Amendment right" was equivalent to a comment on Orren's claim of privilege. But the state's more vehement argument was again in response to defendant's allegations that the state had suppressed exculpatory evidence. The state repeatedly asserted that Orren had provided no exculpatory evidence. The state argued that the inference that defendant would ask the jury to draw was "point-blank a lie" and suggested that defense counsel would violate his ethical obligations as an attorney by making that argument.

The state expressed that it could not "imagine a greater injustice" than the jury acquitting defendant because of an inference that the state had suppressed evidence. The state eventually linked that concern to OEC 403.

Defendant specifically responded to the state's repeated assertions that it was not suppressing exculpatory evidence by directing the court to a prior statement by Orren that he had shot the victim because the victim saw Orren's face. Defendant argued that the statement was exculpatory because it indicated that Orren had not shot the victim as the result of a plan orchestrated by defendant. Defendant then stated:

> "You've already ruled that we can't call him as a witness. Understood. Can't even call him to assert. Understood, okay? Understood. But we should be able to put in the plea agreement."

Defendant responded to the state's arguments about the evidentiary rules, and further argued, "There's got to be some kind of fairness in all of this as well. You can't—you can't give a guy a deal by saying, 'I'm going to give you a deal, but you can't help this guy at all.'"

The trial court, on OEC 513 grounds, held that it would not admit the agreement. But the matter did not end there. Defendant raised the issue at a subsequent hearing, in the context of a discussion about statements by Orren that the state might admit as evidence. The state again contended that defendant should be precluded from arguing that the state had prevented Orren from testifying. Defendant, acknowledging that he was "beating a dead horse," argued that "that's exactly what they did in their agreement."

Next, at a hearing on a motion *in limine*, on March 1, 2016, when the state sought to admit one of Orren's out-of-court statements, defendant broached the plea agreement issue once more. In addition to repeating his earlier arguments, defendant argued that

> "I believe it's a violation of due process to allow them to forbid him to come in and require him not to come in and require him to take the Fifth and then say, 'Oh, but now we can put in anything we want from what he was saying before.'"

Defendant argued, again, that he should in some form be permitted to argue to the jury about the state's suppression of evidence. The state then reiterated its position and indicated that it would request a mistrial if defendant raised the issue in front of the jury, even in the form of a speaking objection. The state noted that the issue was "a big part of [defendant's] case." The trial court stated:

> "I think he's made his record. *** And I assume, [defense counsel], you're—you've been very vehement about this issue on numerous occasions. *** And you—you've advocated *** very well."

Defense counsel continued to press the issue, in the context of a "less satisfactory evidence" jury instruction.

The jury instruction issue came up again, after the close of evidence. Defendant requested an instruction that Orren's failure to testify not be held against defendant. The state argued that the jury should be instructed that Orren's failure to testify should not be held against either party. Defendant objected to that instruction, again raising the issue of the plea agreement.

> "I know the Court's ruled on it. I know the Court's allowing me to make my record. I'm just doing it again. His agreement was contrary to any agreement I've ever seen in 38 and a half years, and certainly contrary to the two agreements that were introduced in this particular case for Ms. Endicott and Mr. Bettencourt. *** They did not have to agree not to cooperate with the defendant and not to testify on behalf of the defendant, which is the language of their cooperation agreements."

The parties reiterated, once more, their positions on the plea agreement. The trial court ultimately gave the instruction requested by the state, over defendant's objection that the instruction was false because the state had forced Orren to invoke privilege.

B.   *The Evidence at Trial*

We discuss the evidence at trial only briefly. Although this case involves a complicated fact pattern, most of those details are not pertinent to this appeal.

Defendant lived in Canby with his girlfriend, Smith. Orren and Endicott, Orren's wife, lived next door. The state presented evidence that defendant contacted the victim, who lived in Grants Pass, and asked him to come to the Portland area, where defendant would purchase a large amount of marijuana from him. The victim agreed and, on the night of February 15, 2014, drove for about four hours to meet with defendant.

Over the course of that night, defendant enlisted Orren, Smith, Endicott, and another friend, Bettencourt, in a plan to steal the marijuana from the victim's car. At one point during the night, as related by Endicott, defendant approached Orren's car with a shotgun, which he placed in the car. Later in the night, as related by Bettencourt, defendant gave Orren a handgun—the murder weapon—and told him to hold onto it in case something went wrong.

At least initially, the plan was for defendant to meet with the victim, during which time Orren would break into the victim's car and steal the marijuana. After three aborted attempts to carry out that plan at different locations, defendant decided to bring the victim back to his apartment in Canby. Defendant and Orren communicated throughout the night through texts and phone conversations, and the two shared a phone conversation before they went back to defendant's apartment. Once there, defendant went into his apartment, but the victim did not leave his car. Orren approached the car and fatally shot the victim.

The state supported its case principally though the testimony of Endicott and Bettencourt. The state also presented phone records from defendant, Orren, and the victim. Those records contained the calls made and received by each phone, the content of the text messages sent and received, and location information for each of the phones on the night of the crime. Several exhibits contained phone records, but the state principally directed the jury's attention to a color-coded exhibit produced by the state's expert, which consolidated information from the various sets of phone records. The information contained in that exhibit broadly corroborated the timeline of events and locations presented by the state. The exhibit also documented phone calls between Orren and

defendant, which had been testified to by the other witnesses, including a phone call shortly before Orren killed the victim. The exhibit contained text messages between defendant and the victim, including a February 15 text message from defendant proposing a drug deal. The exhibit also reported informal text messages between defendant and the victim in the two weeks before the victim's murder and numerous phone calls between the two.

Defendant testified at trial. He offered a version of events that was largely congruent with the state's theory of the case but differed in important respects. Defendant testified that the victim had been in on the planned theft—that defendant and the victim had conspired to take the marijuana and make it look like a theft in order to defraud the victim's supplier. Defendant testified that he had not told Orren, or anyone else, about that plan. He testified that he never gave Orren a gun and that he had not known that Orren had a gun. Crucially, defendant testified that the plan had always been for Orren to perform a "smash and grab"—that is, to steal the marijuana from the victim's car when the victim was absent. Defendant testified that the plan that he had worked out with his co-conspirators had never been to rob the victim, much less to kill him.

In closing, the state noted the congruence of the competing narratives, stating, "A lot of this isn't really in dispute, correct? Basically, what happened and where they went." But the state emphasized that, where accounts differed, no other witness had testified to defendant's version of events:

> "And the only person who tells you about that second statement or story, Francis Paul Weaver. That's the only source of that information, if you believe him. Doesn't make sense."

The state returned to that theme in rebuttal:

> "So the question is: Will you believe it? Because this whole choreographed dope rip comes from one source: Francis Weaver. You have to believe him. Deep down in your gut, deep down in your heart, do you believe him or do you believe the evidence?"

Defendant was convicted on all counts.

C.   *Proceedings on Appeal*

Defendant appealed, raising two assignments of error. First, he argued that the state had violated his compulsory process rights, under both the state and federal constitutions, by making Orren unavailable as a witness. Defendant also argued that the trial court had erred in excluding the plea agreement under OEC 513, and that, properly read, the rule did not apply to these circumstances.

The state argued that defendant had failed to preserve his first assignment of error and that, in any event, the plea agreement did not violate defendant's constitutional rights. The state also argued that the trial court had properly excluded the plea agreement under OEC 513.

The Court of Appeals affirmed defendant's convictions. It held that the compulsory process clause challenge failed because defendant had not preserved it. *Weaver*, 296 Or App at 463. And it held that the trial court had properly applied OEC 513 in excluding Orren's plea agreement.

Defendant filed a petition for review, which we allowed.

## II.   ANALYSIS

A.   *Preservation*

We first address defendant's compulsory process challenge. Because the state's arguments in this court, as in the Court of Appeals, focus on preservation, we begin there.

"The general requirement is that an issue, to be raised and considered on appeal, ordinarily must first be presented to the trial court is well-settled in our jurisprudence." *Peeples v. Lampert*, 345 Or 209, 219, 191 P3d 637 (2008). Preservation is a prudential doctrine, and its requirements "can vary depending on the nature of the claim or argument; the touchstone in that regard, ultimately, is procedural fairness to the parties and to the trial court." *Id.* at 220.

Many of our cases on preservation concern whether a minimal or relatively cursory argument in the trial court was sufficient to preserve the issue for appeal. *See, e.g.*, *State*

*v. Clemente-Perez*, 357 Or 745, 359 P3d 232 (2015); *State v. Walker*, 350 Or 540, 258 P3d 1228 (2011); *State v. Parkins*, 346 Or 333, 211 P3d 262 (2009). This is manifestly not such a case. Defendant raised the issue of Orren's plea agreement before the trial court. He returned to the issue repeatedly and well past the point of futility. He raised it in a written memorandum, in three separate pretrial hearings, during a hearing on a motion *in limine*, and again after the close of evidence. He specifically argued, multiple times, that the agreement was unlawful because it denied him the ability to present exculpatory evidence—the same argument that he makes on appeal. Moreover, defendant asked the trial court to take specific actions to remedy that harm. At a minimum, at the July 27 hearing and in the October 20 motion, he requested that the trial court allow him to introduce the plea agreement into evidence. Neither the state nor the trial court could justly plead ignorance of the nature of defendant's complaint; the trial court acknowledged that defendant had advocated "very well" and that he had "made his record." The state's preservation argument, consequently, is more technical than practical in nature.

First, the state argues that, although defendant raised the issue of the plea agreement in the trial court, he never argued that his compulsory process clause rights were violated; rather, according to the state, defendant focused on evidentiary issues and did not make a constitutional argument. Thus, the state reasons, defendant did not preserve the particular argument that he raises now.

While it is true that defendant never used the words "compulsory process clause" in the trial court, that point alone is not dispositive.

> "We have previously drawn attention to the distinctions between raising an *issue* at trial, identifying a *source* for a claimed position, and making a particular *argument*. The first ordinarily is essential, the second less so, the third least."

*State v. Hitz*, 307 Or 183, 188, 766 P2d 373 (1988) (emphasis in original; internal citation omitted). We conclude that defendant sufficiently alerted the court and the state that he was raising a constitutional claim. At the July 27

hearing, defendant broached the subject of the plea agreement by linking it to his right to a "fair trial," language that suggests more than a narrow evidentiary argument. Moreover, the substance of defendant's argument—that the state was suppressing exculpatory evidence—had obvious constitutional implications. And the state picked up on those constitutional implications, beginning its own argument by referring to its "constitutional obligations both in the state and federal system, and under *Brady*, of course, to provide any exculpatory information to the defendant," and asserting that it had not suppressed exculpatory evidence. At that early point, therefore, both parties recognized that the issue had a constitutional dimension, and the state expressly addressed it in responding to defendant's arguments. From then on, defendant continued to press his contention that the state was suppressing exculpatory evidence.

To be sure, *Brady*, the only specific case cited in that exchange, was a federal decision under the Due Process Clause, not the compulsory process clause, and an unelaborated reference to a right to a fair trial, in a different context, might have been insufficient to preserve a compulsory process clause challenge under either the Oregon or United States constitution. Here, we understand those arguments to sufficiently place before the trial court the contentions now raised on appeal. Defendant did not simply make some generic invocation of a right to a fair trial; rather, he linked that consideration to a specific argument that the state had suppressed exculpatory evidence *by prohibiting a witness from testifying*, an argument that communicated that defendant's right to call witnesses was at issue. The record shows that the parties recognized that a constitutional issue was in play, and the content of the parties' arguments makes clear that the parties understood the substance of that issue— whether Orren's plea agreement interfered with defendant's access to exculpatory evidence.

On appeal, both parties have refined their arguments, and they engage with relevant case law to a greater extent than either did in the trial court. Yet the parties have not moved far from the central concerns developed in the trial court around the interference with access to

exculpatory evidence, and the federal compulsory process clause case law that they cite, which they rely on in developing arguments under both state and federal constitutions, is based on cases that relied on *Brady*, the Due Process Clause case cited by the state in the trial court. In the case on which both parties rely most heavily, *United States v. Valenzuela-Bernal*, 458 US 858, 102 S Ct 3440, 73 L Ed 2d 1193 (1982), the Supreme Court acknowledged that it had "borrowed much of [its] reasoning with respect to the Compulsory Process Clause of the Sixth Amendment from cases involving the Due Process Clause of the Fifth Amendment," principally *Brady*. *Valenzuela-Bernal*, 458 US at 872. Viewing the record as a whole, we conclude that defendant's arguments below sufficiently put the state and the trial court on notice of the arguments that he advances on appeal.

Second, the state argues that the sole reason that defendant wanted to call Orren was to have him invoke privilege on the stand and that defendant did not seek to call Orren as a fact witness. The record unambiguously establishes otherwise. It is true that the state's initial motion adopted that framing, asking the trial court to bar defendant from calling Orren to invoke privilege. That is how the trial court characterized the motion at the outset of the July 27 hearing, and defendant initially agreed that that was how he understood the state's motion as well. But, throughout the hearing, defendant principally took the position that he should be allowed to call Orren because Orren had no privilege to invoke. Given defendant's position that (1) he should be allowed to call Orren as a witness and (2) Orren had no privilege to invoke, his purpose in calling Orren could not have been simply to elicit an invocation of privilege in front of the jury. Defendant then put Orren on his witness list, alongside other fact witnesses. He never informed the court that he *only* wanted to call Orren to invoke privilege. Indeed, at the August 20 hearing, after having heard defendant's argument, the trial court framed the issue, without objection by the state, as "whether or not [Orren] was going to be compelled to come in *and testify*." (Emphasis added.)

In response, the state notes that one of the cases that defendant relied on in arguing that Orren was no longer in

jeopardy, and hence no longer had any constitutional privilege against testifying, was *Barone*, which the state characterizes as involving a witness who was called solely for the purpose of invoking privilege. But defendant relied on *Barone* only as authority for his argument that Orren did not retain his constitutional privilege after a guilty plea; he never indicated that *Barone* offered a preview of his purpose in calling Orren.[4]

Finally, the state argues that defendant failed to preserve the issue because he failed to seek a "remedy consistent with a finding of a compulsory-process violation." That is, the state contends that even if defendant did argue that the plea agreement violated the compulsory process clause, the state's position is that defendant failed to preserve the argument because he sought the wrong remedy. The state relies on *State v. Wyatt*, 331 Or 335, 15 P3d 22 (2000). In that case, the trial court excluded the testimony of a defense witness because of a discovery violation. *Id.* at 338. The defendant attempted to explain his failure to provide notice to the state, but he "did not ask the trial court to consider alternatives to precluding [the witness's] testimony." *Id.* On appeal, the defendant argued that the trial court should have imposed a less onerous sanction. This court held that the defendant had not preserved that argument because of his "failure to object to the particular sanction imposed by the judge or, in the alternative, to argue for some other sanction[.]" *Id.* at 343.

Defendant is not in the same position as the defendant in *Wyatt*; his contention on appeal is not that the trial

---

[4] Moreover, the state's argument that citing *Barone* indicated that defendant did not want to ask Orren factual questions about the murder ignores the facts of *Barone*. *Barone* involved a murder trial, where the state intended to call one of the defendant's co-conspirators as a witness "to testify about defendant's role in the murder." *Barone*, 329 Or at 229. The co-conspirator, who had already been tried and convicted of the murder, attempted to invoke his Fifth Amendment privilege against self-incrimination. *Id.* at 229-30. The trial court rejected the co-conspirator's claim of privilege and required him to testify. *Id.* During trial, the state called the co-conspirator to the stand and asked him factual questions about the defendant's involvement in the murder, which the witness refused to answer. *Id.* At the state's request (and outside the presence of the jury), the trial court held the witness in contempt. *Id.* It may have been the case that the state anticipated that the co-conspirator would refuse to testify, but the state went to great lengths to obtain his testimony.

court selected the wrong remedy, much less that it failed to grant him a remedy that he never requested. Rather, he assigns error to the trial court's failure to grant him any remedy, including the principal remedy that he requested, which was that the plea agreement be admitted as evidence. That argument was preserved. The issue at this stage is not whether defendant selected the appropriate remedy or what the ideal remedy would have been in this case; rather, it is whether he preserved the argument that he makes on appeal, and we conclude that defendant did.

B.   *The Compulsory Process Clause*

We next turn to the merits. Although defendant raises a compulsory process claim under both constitutions, both parties focus their briefing on the federal constitution, and they cite predominantly federal cases. Nevertheless, we consider the state constitutional issue first.[5] *State v. Copeland*, 353 Or 816, 821, 306 P3d 610 (2013) ("As part of the 'first things first' methodology, we consider state constitutional issues before we consider federal claims."). Article I, section 11, of the Oregon Constitution provides, in pertinent part, that "[i]n all criminal prosecutions, the accused shall have the right *** to have compulsory process for obtaining witnesses in his favor[.]" That refers most obviously to the right to obtain the presence of a witness by subpoena, but we have held that

> "[t]he right to subpoena a witness into the courtroom is an empty right absent the related right to obtain the testimony of the witness. We have no hesitation in concluding that the clause protects both the right to the attendance of the witness and the testimony of the witness."

*State v. Mai*, 294 Or 269, 272, 656 P2d 315 (1982).

---

[5] The parties appear to assume that the result under the Sixth Amendment and under Article I, section 11, would be the same. In the past, however, we have conducted distinct analyses under both compulsory process clauses, when a case involved claims under both. *See State v. Lajoie*, 316 Or 63, 72-81, 849 P2d 479 (1993) (first analyzing whether a preclusion sanction violated Article I, section 11, then addressing whether it violated the Sixth Amendment). Because we resolve this case under Article I, section 11, and rely on federal case law only to the extent that it is persuasive, we do not address whether we would reach the same conclusion under the Sixth Amendment.

The state does not dispute that Orren was a competent witness who could have offered relevant testimony;[6] under the applicable evidentiary rules, defendant could have called Orren as a witness. Absent the plea agreement, had defendant called Orren as a witness, Orren could have been free to make his own choice as to whether or not to exercise his constitutional right against self-incrimination. The plea agreement required him to make the choice that the state wanted him to make: to invoke privilege and to refuse to testify. The state's actions interfered with defendant's "right to obtain the testimony of the witness," *Mai*, 294 Or at 272, protected by the compulsory process clause of Article I, section 11. We are not called to balance Orren's right to remain silent against defendant's right to call Orren as a witness; the violation at issue here is not Orren's choice to invoke privilege, but rather the state's action in requiring him to do so.

Under the Sixth Amendment, many courts, including the Supreme Court, have long recognized that similar actions may violate the compulsory process clause. In *Webb v. Texas*, 409 US 95, 93 S Ct 351, 34 L Ed 2d 330 (1972), the trial judge gave the defendant's only witness (and only that witness) a strongly-worded warning about perjury, a warning which implied that the judge "expected [the witness] to lie, and went on to assure him that if he lied, he would be prosecuted and probably convicted for perjury[.]" *Webb*, 409 US at 97. The witness subsequently refused to testify. *Id*. The Supreme Court reversed the conviction, holding that,

> "in light of the great disparity between the posture of the presiding judge and that of a witness in these circumstances, the unnecessarily strong terms used by the judge could well have exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify."

*Id*. at 98.

---

[6] Oregon's rules of evidence take a broad view of competency as a witness; OEC 601 and OEC 602 provide that, with limited exceptions, any person with personal knowledge of a matter and "who, having organs of sense can perceive, and perceiving can make known the perception to others, may be a witness." The rules take a similarly broad view of relevance: "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 401.

Other courts have repeatedly held, in one form or another, that

> "[t]hreats against witnesses are intolerable. Substantial government interference with a defense witness' free and unhampered choice to testify violates due process rights of the defendant."

*United States v. Goodwin*, 625 F2d 693, 703 (5th Cir 1980). *See also United States v. MacCloskey*, 682 F2d 468, 479 (4th Cir 1982); *United States v. Morrison*, 535 F2d 223, 228 (3d Cir 1976); *United States v. Thomas*, 488 F2d 334, 336 (6th Cir 1973).

Thus, plea agreements that forbid a witness from testifying for a defendant have consistently been held to violate a defendant's constitutional rights. As one court put it, "in order to secure a specific term of imprisonment, the witnesses had to agree not to testify in defendant's trial. It is hard to imagine a more explicit form of coercion than that." *People v. Treadway*, 182 Cal App 4th 562, 569, 106 Cal Rptr 3d 99 (2010). *United States v. Henricksen*, 564 F2d 197, 198 (5th Cir 1977), like this case, involved a codefendant required not to testify by a plea agreement. On appeal, the government confessed error, and the Fifth Circuit reversed, reaffirming that "[s]ubstantial Government interference with a defense witness' free and unhampered choice to testify violates due process." *Id.* at 198. *See also State v. Fort*, 101 NJ 123, 130, 501 A2d 140, 143-44 (1985); *Bhagwat v. State*, 338 Md 263, 280, 658 A2d 244, 252 (1995) ("[A] plea agreement conditioned upon a witness refraining from testifying for the defendant is improper[.]").

On review, the state acknowledges that such agreements are problematic, as a general matter. Nonetheless, the state argues that a plea agreement restricting a defense witness from testifying violates the compulsory process clause only if the defendant can prove a number of prerequisites: that the witness would have testified in the absence of the agreement, that the witness's testimony would have been exculpatory, and that the witness's testimony "probably would have changed the outcome of the proceeding."

We take up each of those contentions in turn. First, the state argues that, to prove a constitutional violation,

defendant must show that, in the absence of the plea agreement, Orren would have testified. When interpreting the federal compulsory process clause, courts often have framed the proper inquiry in terms of interference with the witness's choice and have not imposed a consistent standard of causation. *See Soo Park v. Thompson*, 851 F3d 910, 921-22 (9th Cir 2017) (reviewing the "variety of causation standards for claims of witness interference" in federal circuit courts, but not settling on one). Some state courts, interpreting the federal constitution, have expressly rejected the kind of causation standard advocated by the state. *See Treadway*, 182 Cal App 4th at 571 (2010) (holding that a defendant's compulsory process rights do not "evaporate based on the abstract possibility the codefendants would have invoked their Fifth Amendment privilege. As defendant aptly points out, absent the plea agreement, his codefendants had an absolute right to choose to testify."); *Fort*, 101 NJ at 130, 501 A2d at 144 (noting the difficulty involved in showing why a witness invoked privilege when an agreement required him not to testify).

We conclude that, under Article I, section 11, evidence that the witness would have testified absent the state's interference is not required to establish a violation, at least in the context of a plea agreement that flatly prohibits a witness from testifying. The right to compulsory process does not guarantee that a witness will obey a subpoena, come to court, waive privilege, or otherwise prove cooperative. But the compulsory process clause, adopted to ensure that defendants have tools to deal with witnesses who would not testify unless compelled, protects at least the right to try. *See State ex rel Upham v. Bonebrake*, 303 Or 361, 365, 736 P2d 1020 (1987) ("The compulsory process clause of the Oregon Constitution was designed to overturn the common law rule that a person charged with a felony was not entitled to compulsory process for his witnesses."). It follows that a prosecutor who thinks that a witness is unlikely to testify for a defendant cannot tighten the screws just to make sure. Here, absent the condition in the plea agreement, defendant could have called Orren as a witness, and Orren could freely have decided whether to claim the privilege. The plea agreement substantially interfered with

that otherwise "free and unhampered choice." *Henrickson*, 564 F2d at 198. Specifically, it provided that, should he testify, Orren would not be allowed to withdraw his guilty plea, but his case "would then commence to the penalty (sentencing) phase," where he would face a presumptive sentence of life without parole and a possible sentence of death.

Next, the state argues that, to establish a compulsory process clause violation, defendant needed to show that Orren's testimony would have been exculpatory and that it would have probably led to a different result. For these requirements, the state relies on a federal case, *Valenzuela-Bernal*, 458 US 858. In that case, the federal government arrested the defendant and three of his passengers after he drove through a Border Patrol checkpoint, and the defendant was charged with an immigration-related offense. *Id.* at 861. The government interviewed the passengers, who were not lawfully in the country, and deported two of them after determining that they had no evidence material to either the prosecution or the defense. *Id.* The defendant argued that the government had violated his compulsory process rights by not detaining the witnesses for long enough for them to be interviewed by defendant or his counsel, although he offered no explanation of how the witnesses could have supported his defense. *Id.*

The Supreme Court held that the defendant had not shown a violation of his rights. Its analysis began with a lengthy discussion of the "dual responsibility" of the government in enforcing immigration laws, as it may have the "obligation of prosecuting persons in the position of [the defendant] on criminal charges, and at the same time [be] obligated to deport other persons involved in the event in order to carry out the immigration policies that Congress has enacted." *Id.* at 864. The Court noted many considerations supporting the government's policy of prompt deportation of witnesses without material evidence, because "the detention of alien eyewitnesses imposes substantial financial and physical burdens upon the Government, not to mention the human cost to potential witnesses who are incarcerated though charged with no crime." *Id.* at 865. The Court stated that the government had acted in good faith and that its conduct was "not to be judged by standards which might

be appropriate if the Government's only responsibility were to prosecute criminal offenses." *Id.* at 866.

Next, relying on a line of due process cases, including *Brady*, the Court held that, to establish a compulsory process clause violation, a defendant "must at least make some plausible showing of how [the witnesses'] testimony would have been both material and favorable to his defense." *Valenzuela-Bernal*, 458 US at 867. By "material," the Court meant not that the evidence would be relevant to a matter in dispute, but as a term of art used in many federal cases, beginning with *United States v. Agurs*, 427 US 97, 96 S Ct 2392, 49 L Ed 2d 342 (1976), to refer to evidence with a reasonable probability of affecting the result of the trial.[7] Indeed, the Court reasoned that, "[b]ecause determinations of materiality are often best made in light of all of the evidence adduced at trial, judges may wish to defer ruling on motions until after the presentation of evidence." *Id.* at 874. Nevertheless, the Court took into account the fact that the defendant had no access to the witnesses at all after his arrest, stating that "this difference may well support a relaxation of the specificity required in showing materiality," but not dispensing with it entirely. *Valenzuela-Bernal*, 458 US at 870. The Court observed that "the events to which a witness might testify, and the relevance of those events to the crime charged, may well demonstrate either the presence or absence of the required materiality." *Id.* at 871. It also noted that the defendant was present throughout the entire crime and would have been in a good position to know what the witnesses might testify to. *Id.*

It is not clear whether, for federal purposes, *Valenzuela-Bernal* was intended to establish a standard applicable in all types of cases. *See id.* at 873 n 9 ("In adopting this standard, we express no opinion on the showing which a criminal defendant must make in order to obtain

---

[7] In its brief, the state notes this standard, but characterizes it as requiring that defendant show that the testimony "probably would have changed the outcome of the proceeding." That is incorrect. The federal reasonable probability standard, which also governs the state's *Brady* obligations, sets a lower bar. *See Agurs*, 427 US at 111 ("[T]he defendant should not have to satisfy the severe burden of demonstrating that newly discovered evidence probably would have resulted in acquittal[.]").

compulsory process for securing the attendance at his criminal trial of witnesses within the United States."). At least one federal circuit court has taken the view that it was limited to its context:

> "We do not view *Valenzuela* as setting forth a static rule in respect to the showing a defendant must make in every case. Rather, *Valenzuela* reflects the proper balancing in that particular setting, a setting where the federal interest weighing against access to the witnesses was particularly strong, and where the crime was one in which the accused and the putative witnesses had jointly participated. The showing of materiality and favorableness that an accused must make in one setting may not be the same as in another, since the accused's ability to predict what the witness will say may vary, as will many other relevant factors, including the harm to the government in being forced to produce the witness."

*United States v. Bailey*, 834 F2d 218, 223 (1st Cir 1987).

In any event, in our Article I, section 11, analysis, *Valenzuela-Bernal* is only authority to the extent that it is persuasive, and although it persuades us that a more rigorous showing may sometimes be appropriate, it does not persuade us that one is required in circumstances materially different from those considered in *Valenzuela-Bernal*. In *State v. Elliott*, 276 Or 99, 553 P2d 1058 (1976), we considered whether the state's failure to disclose the identity of a confidential informant violated the defendant's compulsory process rights. We reasoned that

> "[n]o fixed rule with respect to production is justifiable. The problem is one which calls for a balancing of the public's interest in protecting the flow of information against the individual's right to make his defense."

*Id.* at 102. We noted that the state had an important interest in protecting the witness's safety, and that it would have been easy for the defendant to make a more substantial showing of his need for the evidence. *Id.* at 103.

Although *Elliott* was a decision under the federal compulsory process clause, its attention to the nature of the justification for the restriction is consistent with our

decisions, admittedly limited in number, under Article I, section 11. In *Mai*, we considered the constitutionality of excluding the defendant's witness as a sanction for his refusal to comply with a reciprocal discovery law. We noted that, "[i]n appropriate cases, constitutional rights must accommodate other legitimate interests in the criminal trial process," 294 Or at 275, and observed that "[t]he ultimate aim of the reciprocal discovery statutes is largely congruent with [the purpose of the right protected by the compulsory process clause] in the sense that such statutes insure that both sides have access to all the facts so that the jury can best determine where the truth lies." *Id.* at 274.

But we have also emphasized that the right cannot be denied for no reason. We held in *Mai* "that the intrusion upon the defendant's right to call witnesses should be no more than is necessary to achieve the purpose of the statutes." *Id.* at 277. And we have stated that

> "'[w]hen all is said and done, in every criminal proceeding, as well as in the trial of all other cases, the primary aim of the law is to arrive at the truth of the matter in controversy, and no obstacle should be sanctioned that would deny the presence of a competent witness who has knowledge of material facts.'"

*State v. Gann*, 254 Or 549, 568, 463 P2d 570 (1969), *overruled on other grounds by Ramos v. Louisiana*, ___ US ___, 140 S Ct 1390, 206 L Ed 2d 583 (2020) (quoting *State ex rel. Gladden v. Lonergan*, 201 Or 163, 189, 269 P2d 491 (1954)).

With that in mind, we note three factors that are important to our decision in this case. First, the state has articulated no legitimate interest that is served by including in the plea agreement a blanket prohibition, enforced by a severe sanction, against Orren testifying or cooperating "in any way" on behalf of defendant. The plea agreement itself states that its purpose was to prevent perjury, and the state echoes that concern in its briefing in this court, suggesting that "the state sought to prevent Orren from perjuring himself by falsely exculpating defendant." Perjury, of course, is a criminal offense, and the state has an obvious and legitimate interest in preventing it. But that interest

cannot justify forbidding a witness from offering truthful testimony, which this agreement unambiguously did. Moreover, "the fundamental right that the compulsory process clause aims to protect is 'the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies.'" *Mai*, 294 Or at 274 (quoting *Washington v. Texas*, 388 US 14, 19, 87 S Ct 1920, 18 L Ed 2d 1019 (1967)). The state cannot, consistent with Article I, section 11, prevent a defendant's witnesses from testifying at all in the name of avoiding perjury.[8]

Second, unlike in *Valenzuela-Bernal* and the *Brady* line of cases on which *Valenzuela-Bernal* relied, the violation alleged here does not involve the state's *failure* to take some affirmative action *favorable* to defendant, such as detaining a witness or disclosing exculpatory evidence. This is not even a case where, through the subpoena process, the defendant has enlisted the state's assistance in obtaining the presence of a witness. The prosecution here acted affirmatively to block the testimony of a witness that it believed defendant would call. Any violation was easily avoidable and can be quite easily avoided in all future cases; all the state needs to do is nothing.

Third, the plea agreement itself barred defendant from investigating what Orren's prospective testimony would be. The agreement prohibited Orren from "cooperat[ing] in any way on behalf of any of the codefendants." Forbidding Orren from cooperating with any pretrial investigation by defendant appears designed to prevent defendant from learning whether Orren might offer exculpatory testimony—at the very least, that condition appears to have little to do with preventing perjury, and the state has offered no other reason for its inclusion or its scope. And, of course, defendant could not investigate the content of

---

[8] Defendant did not challenge the conditions in the Bettencourt and Endicott plea agreements that required them to tell the truth; in the trial court, he contrasted those conditions with the more restrictive condition in Orren's plea agreement in order to support his argument that the latter was unusual and problematic. Consequently, nothing that we say in this case should be understood to call into question plea agreements that simply forbid perjury.

Orren's testimony by calling him as a witness at a pretrial hearing, because the agreement required Orren to invoke privilege. The impediment created by the plea agreement itself is pertinent to the showing that defendant should be required to make.

We recognize that, as in *Elliott* and *Valenzuela-Bernal*, defendant was present for many key events and could have offered insight, perhaps by testifying himself at a pretrial hearing, as to what he believed Orren's testimony would be. But defendant, through counsel, *did* offer a preview of his defense at a hearing and in his written motion, when he set out how he believed that Orren's testimony would be relevant. To require more—in particular, to require defendant to testify—would only reward the state for its improper conduct in interfering with defendant's compulsory process right. The calculus would be different if there were some legitimate reason for the state to have restricted Orren's testimony, but the state offers no reason other than its asserted interest in preventing perjury, which, as we have explained, was inadequate to justify this agreement.

Finally, we note that a requirement of "materiality," in the *Brady* sense of evidence with a reasonable probability of affecting the outcome, is particularly inapt here. At this stage, we are not dealing with the question of whether defendant's conviction must be reversed, only with the question of whether the state unconstitutionally interfered with his right to call a witness. While the harmlessness of an error may provide a basis for affirmance notwithstanding a constitutional violation, a defendant's right to call a witness cannot be denied solely because the defendant will likely be convicted even if the witness does testify.

For those reasons, we see no cause for a rule more complicated than "the state may not do this." Defendant did not need to make any additional showing about the content of Orren's testimony in order to establish a constitutional violation, much less its likely effect on the result of the trial. Defendant made a sufficient showing that his rights were implicated by showing that Orren was a defense witness, that he was competent to testify, and that he could offer

material—meaning relevant—testimony. All those conditions were met here.[9]

Defendant established that the state violated his compulsory process clause right by making that showing and pointing to the plain terms of Orren's plea agreement. At that point, the trial court was, as defendant requested, obligated to take action to remedy the violation. The trial court erred in failing to do so.

## C.  *Harmless Error*

A conviction can be affirmed despite constitutional error if the error is harmless. As we explained in *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003), "Oregon's constitutional test for affirmance despite error consists of a single inquiry: Is there little likelihood that the particular error affected the verdict?" In this case, the trial court's error consisted of denying defendant any remedy for the constitutional violation. For the purpose of the harmless error analysis in this case, we focus on the principal remedy that defendant requested: admission of the plea agreement. Although, as we discuss below, we do not conclude that that would have been the only permissible remedy, or even an adequate remedy on its own, we need not go further to determine that the error in this case was not harmless.

In the trial court, both parties recognized that admission of the plea agreement would have a significant impact on the jury. The prosecution went so far as to state that it would move for a mistrial—at the end of a lengthy murder trial—if defense counsel even adverted to the agreement's existence. On appeal, the state acknowledges that the plea agreement was relevant and that it supported an inference that the state had made efforts to suppress exculpatory evidence. Nevertheless, it argues that the agreement

---

[9] Indeed, the record in this case would justify the same result, regardless of which standard we selected. The key issue in defendant's trial was whether the plan was just a "smash and grab" theft, or whether at some point defendant conspired with Orren to rob or murder the victim. In Orren's final police interview, which was part of the record and the contents of which were repeatedly referred to in discussions of whether the state was suppressing exculpatory testimony, he stated, "My involvement was literally just a smash and grab. Smash the window and grab the stuff. Nothin' more."

also supports a different inference: "That is, had defendant offered the plea agreement to attempt to show that the state was attempting to prevent truthful exculpatory testimony, the agreement, on its face, explains that the state's purpose was to avoid the risk of perjured testimony."

That argument has several difficulties. First the agreement's statement of its own purpose, if relied on to establish the truth of the matter asserted, would be hearsay. *See* OEC 801. The state points to no applicable exception. Second, the state points to no other persuasive evidence that the agreement was intended to prohibit *only* perjured testimony. And, even if there were such evidence, the fact that the agreement does not forbid only perjured testimony supports a contrary inference. Third, even if it could be conclusively established that the prosecutors responsible for the agreement believed that any exculpatory evidence offered by Orren would be false, one is left to wonder why that would matter. The jury would not, of course, be permitted to infer from the prosecution's faith in its own case that Orren's testimony would have been false. Even on the most favorable view of the plea agreement—as the state itself phrases it, "that the state sought to prevent Orren from perjuring himself by falsely exculpating defendant"—the jury would be left to infer that the state had done its utmost to prevent it from seeing certain exculpatory evidence. That, alone, could sustain a reasonable doubt.

The state also argues that its other evidence sufficiently made the case against defendant, given the implausibility of the defense. But key parts of its case rested primarily or exclusively on the testimony of Bettencourt and Endicott, two accomplices who had avoided murder convictions by cooperating with the prosecution. In its closing, the state placed heavy emphasis not on the unimpeachable quality of their testimony, but on the fact that it was their testimony against that of defendant alone. The state repeatedly returned to the theme that, in contrast to the testimony of Bettencourt and Endicott, the only person who supported defendant's story was defendant himself. That argument might have played differently had the jury not been kept ignorant of Orren's plea agreement. The phone

records offered more straightforward support for the state's case, and certainly confirmed the timeline. But, at least as presented to the jury, those records lent some support to defendant as well, by documenting frequent communications between defendant and the victim, which could be understood as corroborating defendant's testimony that he had conspired with the victim.[10] In short, considering the evidence presented by the state—and the exclusion of Orren's possible testimony and of Orren's plea bargain—we conclude that the trial court error was likely to have influenced the verdict.

D.  *Remand*

We therefore conclude that the state's violation of Article I, section 11, requires defendant's convictions to be reversed. Because defendant may be retried, we believe that it is appropriate to address two issues that may arise on remand. *State v. Sperou*, 365 Or 121, 141, 442 P3d 581 (2019) (addressing "issue likely to arise again on remand" after determining that the defendant's convictions needed to be reversed).

1.  *Orren's plea agreement*

As explained above, insofar as defendant wishes to call Orren as a witness, as he did in his initial trial, the plea agreement barring Orren from testifying violates defendant's constitutional rights. In the trial court, defendant's position was that Orren had no privilege to invoke, but on appeal he conceded that, because Orren had not yet been sentenced for aggravated murder, defendant's position in the trial court was incorrect. It appears that Orren has now been sentenced, but it is not clear whether that is sufficient to prevent the plea agreement from having any further binding effect. The agreement resulted in the dismissal of

---

[10] Defendant's felon-in-possession conviction presents a closer question, but the state has not made any separate harmlessness argument concerning that conviction, and analysis is made more difficult by the multiple theories presented to the jury, each of which relied on different evidence. Even the theories most attenuated from the robbery and murder rested in part on Bettencourt's testimony—the jury's evaluation of which could have been affected by admission of the plea agreement, and the jury's doubt as to one part could extend to others. We cannot conclude that the error was harmless as to that count.

several charges against Orren which could be reinstated if, in the exclusive judgment of the two prosecutors who handled defendant's case, Orren breached the agreement. The agreement specified that it would remain in place through defendant's prosecution and, to ensure that that would be the case, as part of the agreement, Orren waived "any future challenges to his right to a speedy trial, the statute of limitations and his rights against double jeopardy." We do not decide whether, under these circumstances, Orren would still be able to invoke privilege to avoid testifying at defendant's trial, but the answer is hardly straightforward and, to the extent that Orren still can invoke privilege, the plea agreement still would penalize him for choosing not to.

There would be little point in remanding this case for a retrial tainted by the same constitutional violation. But we are confident that the trial court has sufficient tools to ensure that defendant's rights are protected. Our disposition of this appeal does not require us to definitively resolve what course the trial court should take on remand, and the parties have not sufficiently briefed the issue. However, we believe that it is appropriate to provide some guidance.

First, to the extent that Orren retains a privilege to invoke, the trial court cannot remedy the violation of defendant's rights by restricting Orren's. The trial court may act to ensure that Orren is able freely to decide whether to invoke privilege without influence by the state, but, insofar as Orren retains a constitutional privilege, the trial court may not order Orren to testify in violation of his rights. Second, defendant's requests in the initial trial focused on the admission of evidence and jury instructions. In a case where the effect of the government's conduct is to cause the defendant to lose the testimony of a witness irretrievably, as where the government wrongly deports a witness who cannot thereafter be located, the trial court may need to decide whether evidentiary or instructional remedies are sufficient or whether the only acceptable remedy is dismissal of the case. *See U.S. v. Leal-Del Carmen*, 697 F3d 964, 976 (9th Cir 2012) (finding a violation of *Valenzuela-Bernal* and leaving to the trial court to decide "whether to dismiss the charges against Leal-Del Carmen with prejudice, as a consequence

of the government's conduct"). Here, however, the options before the trial court may not be so limited, as the trial court may compel the state to waive the condition in Orren's plea agreement requiring him to invoke privilege and take other actions to limit the effects of the state's prior coercion.[11] However, the precise course to be taken on remand will, no doubt, be shaped by the arguments of the parties, and we believe that the remedial question is best considered by the trial court in the first instance.

   2.   *OEC 513*

Because the issue might arise on remand in a posture not resolved by this opinion, it also is appropriate to address whether OEC 513 would bar admission of the plea agreement. It would not.

OEC 513 is a rule consisting of three provisions:

   "(1)   The claim of a privilege, whether in the present proceeding or upon a prior occasion, is not a proper subject of comment by judge or counsel. No inference may be drawn from a claim of privilege.

   "(2)   In jury cases, proceedings shall be conducted, to the extent practicable, so as to facilitate the making of claims of privilege without the knowledge of the jury.

   "(3)   Upon request, any party against whom the jury might draw an adverse inference from a claim of privilege is entitled to an instruction that no inference may be drawn therefrom."

In the trial court, defendant sought to admit the plea agreement in order to support an argument that "Orren has exculpatory evidence which the State of Oregon is requiring him not to provide in order to get his negotiated deal." That

---

[11] We need not decide whether the condition in Orren's plea agreement is simply void, whether the trial court may unilaterally cancel it, or whether only the state is in a position to waive it. The trial court has ample tools to ensure the state's compliance with its decisions, not the least of which is the possible necessity of dismissing the charges against defendant should the state refuse to remedy the violation. *Cf. Morrison*, 535 F2d at 229 ("At the new trial, in the event that the defendant calls [the intimidated witness] as a witness, if she invokes her Fifth Amendment right not to testify, a judgment of acquittal shall be entered unless the Government, pursuant to 18 USC §§ 6002, 6003, requests use immunity for her testimony.").

inference followed, he argued, from the fact that the state had effectively forbidden Orren from testifying through the plea agreement. As the state acknowledges on appeal, that is a permissible inference. But, as it did below, the state argues that OEC 513 prohibits defendant from making that argument or asking the jury to draw that inference.

The Court of Appeals held that OEC 513(1) and OEC 513(2) each barred admission of the evidence for that purpose. In this court, the state appears to rely primarily on OEC 513(2), but we address both provisions, beginning with subsection (1). That subsection is written in categorical terms. A claim of privilege cannot be the "subject of comment" by counsel, and "no inference" may be drawn from a claim of privilege. OEC 513(1).

The inference that defendant sought to have the jury draw—that Orren's testimony would be favorable to defendant because the state had coerced Orren into withholding it—was not an inference "drawn from a claim of privilege." The basis for concluding that Orren had favorable testimony was not the fact that Orren had invoked privilege, but the fact that the state so insistently wanted him to do so.[12] The inference would be equally valid if Orren had not testified for some other reason, or even if he did testify. Defendant recognized as much in the trial court, where he sought to have the agreement admitted regardless of whether Orren testified. The state was not the holder of Orren's privilege, nor was its suppression of Orren's testimony a privileged act.

However, exhibiting the plea agreement to the jury would involve at least an allusion to Orren's possible invocation of privilege, and Orren's privilege could be seen as implicated in the inference that defendant wished to have the jury draw. Under OEC 513(1), the question is whether defendant's argument was a "comment" on a claim

---

[12] To put the shoe briefly on the other foot, imagine that it had been defendant who threatened to kill Orren if he did not invoke privilege. That threat would be probative evidence of defendant's guilt—not because of what it revealed about Orren, but because of what it revealed about defendant's understanding of the content of Orren's testimony. OEC 513(1) would no more apply in that hypothetical than it applies here.

of privilege. Although the term "comment" could be broad enough to encompass an indirect reference, text and context support a narrowing reading.

OEC 513(1) was enacted in 1981 as part of a general overhaul of Oregon's evidence code. As the conference committee commentary makes clear, OEC 513(1) was based on a federal constitutional decision, *Griffin v. California*, 380 US 609, 85 S Ct 1229, 14 L Ed 2d 106 (1965), which had been codified into a federal evidentiary rule. Legislative Commentary to OEC 513(1). In *Griffin*, a criminal defendant exercised his constitutional right not to testify at his own trial. 380 US at 609-10. The state's closing argument "made much of the failure of [the defendant] to testify," urging the jury to infer the defendant's guilt from his silence, an inference approved of in an instruction given to the jury by the court. *Id.* at 610-11. The Supreme Court reversed, holding that "comment on the refusal to testify" violated the Fifth Amendment because it "cuts down on the privilege by making its assertion costly." *Id.* at 614.

OEC 513(1), like the federal evidentiary rule on which it was based, extended to all evidentiary privileges, not just the constitutional privilege conferred by the Fifth Amendment.[13] The term "comment," as used in OEC 513(1) was evidently derived from *Griffin*. But, by 1981, the Supreme Court had clarified that *Griffin* had not used the word "comment" in an expansive or unconditional manner. In *Lakeside v. Oregon*, 435 US 333, 98 S Ct 1091, 55 L Ed 2d 319 (1978), the trial court instructed the jury, in a criminal case in which the defendant did not testify, that it should *not* hold the defendant's choice not to testify against him, and that the jury should not consider his silence when determining his guilt. *Id.* at 335. The defendant objected, arguing that the instruction was a comment on his claim of privilege forbidden by *Griffin*. *Id.* The Supreme Court disagreed. Calling the argument "semantic," the Court stated that "[i]t is clear from even a cursory review of the facts and the

---

[13]  There has been no argument in this case that admission of the plea agreement at defendant's trial would violate Orren's rights. Although OEC 513(1) has constitutional roots, OEC 513 sweeps more broadly, and the only question before us involves interpretation of the evidentiary rule.

square holding of the *Griffin* case that the Court was there concerned only with *adverse* comment, whether by the prosecutor or the trial judge[.]" *Lakeside*, 435 US at 338 (emphasis in original).

Thus, by 1981, the Supreme Court had expressly rejected the view that "comment," as used in *Griffin*, precluded any mention of privilege. OEC 513(3) reflects that understanding, expressly permitting the type of instruction given in *Lakeside*, and indicating that the purpose of OEC 513 is to prevent "adverse inference[s] from a claim of privilege." Thus, the mere fact that defendant's argument might in some way allude to Orren's claim of privilege does not make it a "comment" on a claim of privilege. The important point is that it does not ask the jury to infer anything, adverse or otherwise, from Orren's claim of privilege. Under OEC 513(1), the state cannot rely on Orren's privilege to bar inferences drawn from its own, unprivileged actions.

Perhaps for that reason, the state most clearly relies on OEC 513(2), arguing that "the court must act to prevent the jury from any 'knowledge' of the invocation." The state is partly correct: OEC 513(2) is, in some respects, a broader rule than OEC 513(1). OEC 513(2) provides that "[i]n jury cases, proceedings shall be conducted, to the extent practicable, so as to facilitate the making of claims of privilege without the knowledge of the jury." While OEC 513(1) forbids parties from arguing inferences based on a claim of privilege, OEC 513(2) is directed toward ensuring that no inference is drawn by preventing juries from being aware of the invocation in the first place. Still, it is not clear that OEC 513(2) sweeps broadly enough to apply here. Orren's plea agreement was not itself a "claim of privilege"; it, together with Orren's failure to testify, would only support an inference that a claim of privilege had been made somewhere else, outside the jury's presence.

But we need not decide that question, because, unlike OEC 513(1), OEC 513(2) does not establish a categorical rule. OEC 513(2) applies only to "the extent practical." It is not clear to what extent OEC 513(2) is ever meant to prevent the jury from hearing probative evidence that might support an indirect inference that someone has invoked privilege,

evidence which is routinely admitted. For example, this trial included copious evidence of Orren's guilt. A juror could easily have inferred from that evidence, combined with Orren's absence, that Orren was not testifying because he had invoked his privilege against self-incrimination, even without introduction of the plea agreement. OEC 513(2) appears to be principally directed to ensuring that the jury does not needlessly hear the invocations of privilege that OEC 513(1) completely deprives of probative value.

Even without resolving how broadly OEC 513(2) might extend, it could not bar admission of Orren's plea agreement, where the risk of any adverse inference drawn against the state based on Orren's *claim of privilege* was nonexistent. To be sure, the state was obviously concerned with an adverse inference being drawn against it *because of the state's own actions*, but that is not a basis for excluding evidence under OEC 513(2). Even if the jury drew the inference that Orren had claimed privilege because of the plea agreement, it could draw no further prejudicial inference from the claim of privilege itself. Given the consequences threatened by the plea agreement, the fact that Orren did invoke privilege would reveal only that (1) he had some exposure to criminal liability, so as to permit him to do so, and (2) he would prefer not to be executed or to spend the rest of his life in prison. Of course, the state's case against defendant rested on its ability to prove that Orren was a murderer, so the former inference was hardly adverse to the state, and the latter inference is of no conceivable prejudicial significance.

Consequently, the trial court erred in completely excluding the plea agreement based on OEC 513.

### III.   CONCLUSION

The state wields substantial power in the plea-bargaining process, and never more than when it can credibly threaten a sentence of death. In this case, the state used that power to forbid a key defense witness from testifying on behalf of the defendant. It also prevented the jury from even learning that the witness had entered into a plea bargain where, in exchange for the state agreeing not to pursue

the death penalty, the witness was precluded from testifying for defendant or cooperating with him in any way. That intentional suppression of potentially exculpatory evidence violated Article I, section 11, of the Oregon Constitution.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.