Argued and submitted November 4, 2003, decision of the Court of Appeals
and judgment of the circuit court affirmed April 29, reconsideration denied
June 29, 2004

STATE OF OREGON,
*Respondent on Review,*

*v.*

ROSITA AMAYA,
*Petitioner on Review.*

(D9707503M; CA A104692; SC S49344)

89 P3d 1163

Peter Gartlan, Chief Deputy Public Defender, Salem, argued the cause and filed the brief for petitioner on review. With him on the brief was David E. Groom, State Public Defender.

Janet A. Metcalf, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Carson, Chief Justice, and Gillette, Durham, Riggs, De Muniz, and Balmer, Justices.**

BALMER, J.

** Kistler, J., did not participate in the consideration or decision of this case.

## BALMER, J.

In this criminal case, we consider the extent to which a police officer who has made a valid traffic stop of a vehicle may question a person in the vehicle about safety matters unrelated to the purpose of the stop. We hold, first, that ORS 810.410(3)(d), set out below, permitted the police officer's inquiries of defendant, who was a passenger in the stopped vehicle. We further hold that, because the officer reasonably was concerned for his safety, Article I, section 9, of the Oregon Constitution permitted his inquiry. Accordingly, we agree with the Court of Appeals that the trial court did not err in refusing to suppress either the statements that defendant made in response to the officer's questions or the weapon that the officer seized from defendant following her statements, although we do so on somewhat different grounds.

## FACTS

We take the facts from the Court of Appeals opinion, *State v. Amaya*, 176 Or App 35, 37-38, 29 P3d 1177 (2001), and from the record. On November 1, 1997, at 1:00 a.m., Officer Reynolds observed a van with a burned-out license plate light stopped in the middle of the road in an area of Beaverton known for drug dealing. The van pulled forward and made an unsignaled left turn. Reynolds stopped the van for the burned-out light and the illegal turn. The van was a full-sized cargo van without windows along the side, and Reynolds was able to see inside the van only when he was standing next to the driver's window or the front passenger's window. When Reynolds approached the van, he noticed that both the driver and defendant, who was a passenger in the van, were nervous. The driver was sweating and shaking, and the defendant was moving around and "tucking" something into a large purse-like bag at her feet. Reynolds immediately felt concerned for his safety, although he did not see any weapons.

Reynolds checked the license of the driver of the van and found that the driver's license was suspended. Because Reynolds did not want to leave the van on the side of the road

overnight, he asked defendant if she was a licensed driver. When she responded that she was, Reynolds took her license to check its validity. At the suppression hearing, neither Reynolds nor defendant could recall specifically when Reynolds took defendant's license, although it appears to have been after he learned that the driver had a suspended license. Nor could Reynolds or defendant recall when Reynolds returned defendant's license to her.

During the stop, Reynolds asked the driver for consent to search the van, which the driver gave. Reynolds asked the driver and defendant to step out of the vehicle while he awaited a second officer. Because of concern about what defendant might have in her bag, Reynolds encouraged her to leave it in the van, although he did not order her to do so. Defendant took the bag with her when she left the van and placed it on the ground between her feet, where it was covered by her trench coat. Reynolds noticed that defendant had taken her bag out of the van and apparently was trying to conceal it. Again, he felt concerned for his safety and believed that defendant might have a weapon or drugs in the bag.

A second officer arrived at some point during the encounter, although when he arrived in the sequence of events is not entirely clear. Reynolds asked defendant what she had in the bag.[1] Defendant said that she had a gun in the bag and that she did not have a concealed weapon permit. Based on that admission, the officers searched defendant's bag and found a gun. The officers also searched defendant and the driver of the van by patting them down or looking in their pockets with a flashlight, although again the record is not clear as to whether that search took place before or after Reynolds asked defendant about the contents of her bag.

---

[1] In its factual summary, the Court of Appeals stated that Reynolds first asked defendant if he could *search* her bag. *Amaya*, 176 Or App at 37. Defendant so testified. However, Reynolds testified that he first asked defendant what was in the bag and that it was only after she said she had a gun that he asked to search the bag. The trial court did not make a specific finding regarding which question came first, although the court's findings suggest that it believed Reynolds's testimony that he asked defendant what was in the bag before asking to search it. The trial court stated that Reynolds "ultimately asked the passenger what was in the purse and, after some conversation about the purse, she eventually told him that she had a handgun and had it for protection, that she did not have a concealed weapons permit."

## PROCEEDINGS BELOW

Defendant moved to suppress both her admission and the weapon. She argued that the questions that Reynolds had asked her exceeded the scope of the traffic stop. The state resisted the motion on two grounds: that Reynolds had had a reasonable suspicion that defendant had been engaged in some form of illegal activity and, alternatively, that Reynolds had been justified in seeking further information about the bag for safety reasons. The trial court agreed and denied the motion to suppress.

The trial court stated that Reynolds, once he had noticed defendant's suspicious concern for the bag, "was entitled to inquire further for his safety and that included asking what was in the purse." *See* ORS 810.410(3)(d) (police officer making traffic stop may make any inquiries to ensure safety, including inquiries regarding presence of weapons). In addition to that statutory authority, the trial court relied on *State v. Bates*, 304 Or 519, 747 P2d 991 (1987), and concluded that Reynolds had had sufficient grounds to ask the questions that he did. "[H]e's entitled to take reasonable [minimally] intrusive steps to determine whether or not there are weapons involved that might be a danger to the officer, and there's enough articulable suspicion here on the part of the officer * * * for him to be concerned about his safety." The trial court also found that defendant had been free to leave the scene and that she had not been required to answer Reynolds's questions. As noted, the trial court denied defendant's motion to suppress, and she subsequently was convicted of unlawful possession of a weapon.

Defendant appealed, and the Court of Appeals affirmed. In the Court of Appeals, defendant made two arguments. First, she claimed that, when Reynolds had taken and retained her driver license, he had "stopped" her separately and independently from the valid traffic stop. That stop had been unlawful, defendant argued, because it had been made without reasonable suspicion that she had been engaged in any criminal activity or had posed an immediate threat of physical injury to Reynolds. The Court of Appeals refused to consider that argument, because defendant had failed to raise it before the trial court. *Amaya*, 176 Or App at 38.

Defendant's second argument, which the Court of Appeals did address, was that the evidence should have been suppressed because Reynolds's questions to her about her bag constituted a seizure without reasonable suspicion that she had been involved in illegal activity or had posed a risk to Reynolds's safety. Defendant contended that, although ORS 810.410(3)(d) appears to authorize inquiries related to officer safety during a valid traffic stop without requiring reasonable suspicion, the court nevertheless should construe that statute to prohibit those inquiries in the absence of reasonable suspicion of an immediate threat to officer safety. Defendant argued that the state and federal constitutions require a showing of reasonable suspicion before an officer may make inquiries that go beyond the basis for the traffic stop. From that premise, she asserted that either ORS 810.410(3)(d) was unconstitutional or that it must be construed to include the reasonable suspicion requirement to preserve its constitutionality. According to defendant, because Reynolds had not reasonably suspected that defendant had had a weapon, his questioning had been unlawful and the evidence that resulted from that questioning should have been suppressed.

The Court of Appeals concluded that ORS 810.410(3)(d) does not require reasonable suspicion of a threat to officer safety as a prerequisite for the questions that the officer asks. *Amaya*, 176 Or App at 39-40. That court also rejected defendant's argument that the state or federal constitution requires such "reasonable suspicion" before an officer makes safety-related inquiries. It concluded that reasonable suspicion was not required unless the questioning constituted a seizure of the person being questioned. *Id.* at 42-44. In this instance, the court concluded, no such seizure had occurred, because the officer's questions had constituted "mere conversation" during which defendant had been free to leave. *Id.* at 44-47.

## DEFENDANT'S STATUTORY AND CONSTITUTIONAL ARGUMENTS

Defendant petitioned for review, arguing that the police officer's questions to her and his seizure of a weapon

from her bag violated her right to be free from unreasonable searches and seizures under Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution. We allowed review to examine defendant's statutory and constitutional arguments.

We begin with ORS 810.410, the statute that authorizes certain police conduct when a police officer makes a valid traffic stop. That statute provides, in part:

"(3)   A police officer:

"* * * * *

"(b)   May stop and detain a person for a traffic violation for the purposes of investigation reasonably related to the traffic violation, identification and issuance of citation.

"(c)   May make an inquiry into circumstances arising during the course of a detention and investigation under paragraph (b) of this subsection that give rise to a reasonable suspicion of criminal activity.

"(d)   May make an inquiry to ensure the safety of the officer, the person stopped or other persons present, including an inquiry regarding the presence of weapons."

Before 1997, ORS 810.410(3) included paragraph (b), but not paragraphs (c) and (d). The statute thus authorized a police officer to stop and detain a person for a traffic violation for the purposes of an investigation reasonably related to that violation, but did not authorize an officer who was conducting a valid traffic stop to make inquiries unrelated to the reason for the stop. This court interpreted the absence of any authority in the pre-1997 version of ORS 810.410(3) to ask questions unrelated to the basis for the stop to bar an officer from asking such questions, unless the officer had a separate, valid basis for those questions. *State v. Toevs*, 327 Or 525, 531, 964 P2d 1007 (1998). In *Toevs*, the officer made a valid traffic stop, questioned the defendant about the infraction that was the basis for the stop, and told the defendant that he was free to go. However, the officer then continued to question the defendant about his possible possession of illegal drugs. Because the continued

questioning by the officer in *Toevs* amounted to a further detention that was not reasonably related to the traffic infraction, and was not independently justified, this court required suppression of the evidence obtained as a result of that questioning. *See also State v. Porter*, 312 Or 112, 817 P2d 1306 (1991) (same).[2] By adding paragraphs (c) and (d) to ORS 810.410(3), the legislature expanded the authority of an officer who has made a valid traffic stop to make inquiries that are unrelated to the traffic infraction that was the basis for the stop. We now consider the text of ORS 810.410(3), following the 1997 amendments.

At the outset, we note several significant distinctions that the current statute draws regarding the kinds of inquiries that a police officer is authorized to make as part of a valid motor vehicle stop. First, the statute authorizes a police officer to "stop and detain a person for a traffic violation for the purposes of investigation reasonably related to the traffic violation * * *." ORS 810.410(3)(b). That provision authorizes only inquiries that are reasonably related to the traffic violation. *See Toevs*, 327 Or at 531; *Bates*, 304 Or at 522 (questions not reasonably related to infraction not permitted under predecessor to ORS 810.410(3)(b)).

Second, under ORS 810.410(3)(c), if the officer, during the stop, develops a "reasonable suspicion of criminal activity," then the officer is authorized to inquire into the circumstances that gave rise to that suspicion. The text of paragraph (c) does not limit the persons to whom the officer may direct an inquiry about criminal activity.

Third, the statute authorizes the officer to make an inquiry "to ensure the safety of the officer" or others, including an inquiry about weapons. ORS 810.410(3)(d). In contrast to an inquiry concerning criminal activity, the text of paragraph (d) does not require "reasonable suspicion" of the presence of a weapon or of a threat to safety as a predicate for an

---

[2] The holding in *Toevs* was based on this court's interpretation of ORS 810.410(3), rather than on state or federal constitutional grounds. However, *Toevs* was consistent with *Bates*, discussed in detail below, in which this court held that Article I, section 9, prohibits an officer conducting a traffic stop from questioning a driver about weapons unless the officer has a reasonable suspicion that the driver poses an immediate threat of serious injury to the officer.

officer's safety-related inquiries. Like an inquiry concerning criminal activity, however, paragraph (d) does not limit the category of persons to whom the officer may direct safety-related inquiries.

Before considering the application of ORS 810.410(3), as summarized above, to this case, we note a shift in defendant's position. In the Court of Appeals, defendant argued that ORS 810.410(3)(d) should be interpreted to require that an officer have reasonable suspicion of an immediate threat of serious physical injury before the officer may ask safety-related questions. In other words, defendant argued that, notwithstanding the legislature's use of the phrase "reasonable suspicion of criminal activity" in ORS 810.410(3)(c), and its omission of the words "reasonable suspicion" in ORS 810.410(3)(d), the court nevertheless should read those words into paragraph (d) to make that paragraph consistent with the requirements of Article I, section 9, as interpreted in *Bates*. The Court of Appeals rejected defendant's argument that the statute should be so interpreted. *Amaya*, 176 Or App at 39-40.

On review, defendant expressly accepts the Court of Appeals' determination that paragraph (d) of ORS 810.410(3) does not require reasonable suspicion of an immediate threat to officer safety, and we also agree with that interpretation. Instead, defendant first makes a statutory argument that paragraph (d) does not apply to the questions asked here and then asserts that the officer's questions violated her state and federal constitutional rights.

■ Defendant's statutory argument is that ORS 810.410(3)(d) does not apply to the officer's questions here because "the officer never asked defendant about the presence of weapons." We disagree, because the statute does not limit permissible questions to those specifically asking about *weapons* but, instead, authorizes "an inquiry to ensure the safety of the officer, the person stopped or other persons present." Here, Reynolds testified that his questions to defendant about the contents of defendant's bag were based on safety concerns, and the trial court made findings to that effect. We

agree with the trial court that Reynolds's questions were of the kind that he had the authority to ask under ORS 810.410(3)(d) because they were asked "to ensure the safety of the officer."

We now turn to defendant's argument that, even if ORS 810.410(3)(d) authorized Reynolds's questions to defendant, the questioning violated defendant's rights under Article I, section 9. As explained above, before the 1997 amendments, ORS 810.410(3) barred officer questions about weapons unless the officer had a separate, valid basis for asking the questions. *Toevs*, 327 Or at 531. Under the current version of the statute, an officer conducting a valid traffic stop may make an inquiry to ensure his or her safety or the safety of others, including an inquiry about the presence of weapons, even if the officer does not reasonably suspect criminal activity or the threat of immediate harm. However, an officer's actions, even if authorized by ORS 810.410(3)(d), nevertheless must comply with Article I, section 9, which provides, in part, "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

Defendant's initial argument—which she also made in the trial court and the Court of Appeals—is that Article I, section 9, requires "reasonable suspicion" before a police officer may question a person during a traffic stop about matters beyond the scope of the traffic infraction that was the basis for the stop. Specifically, defendant argues that this court held in *Bates* that a police officer conducting a valid traffic stop may take reasonable steps to protect himself, including searching or seizing the person who is stopped, only if the officer has a reasonable suspicion that the person poses an immediate threat to the officer. As applied here, defendant argues that (1) Reynolds's questions to her about the bag at least temporarily restrained her liberty and therefore constituted a "seizure" for purposes of Article I, section 9; and (2) because Reynolds did not have a reasonable suspicion that defendant posed a threat to his safety, the seizure violated Article I, section 9.

Defendant also argues that, even if Reynolds's questions about the bag did not constitute an unlawful seizure, he had seized her unlawfully *before* he questioned her about the bag's contents, and the evidence obtained as a result of that questioning therefore was inadmissible. Defendant now states that her "primary" argument in that regard is that she was seized unlawfully when Reynolds searched the pockets of her coat, but she also argues that other circumstances before Reynolds questioned her about the bag constituted an unlawful seizure, including Reynolds's request that she exit the van and stand where Reynolds could see her.

The state responds that the Court of Appeals correctly held that Reynolds's questions to defendant had not amounted to a seizure because they had constituted "mere conversation" between defendant and Reynolds. *Amaya,* 176 Or App at 43-44. The state argues that defendant was free to leave the scene and that she was not required to respond to Reynolds's questions. In those circumstances, the state asserts, Reynolds's questions did not constitute a "seizure," thereby triggering the reasonable suspicion requirement of Article I, section 9. As to defendant's contention that she was seized unlawfully by Reynolds's conduct before he asked about weapons, the state responds that defendant failed to preserve that argument and, on the merits, that she always had been free to leave and therefore never had been seized.

## ANALYSIS

As a preliminary matter, we think it is useful to clarify the issue before us. To the extent that defendant argues that *every* question by an officer that is unrelated to the reason for a valid traffic stop violates Article I, section 9, unless the question is based on reasonable suspicion, we reject defendant's argument. That argument is tantamount to asserting that ORS 810.410(3)(d) is unconstitutional on its face because it allows safety-related questions without requiring reasonable suspicion that there is an immediate threat to the officer's safety. On the contrary, this court's cases demonstrate that some encounters between a police officer and a citizen are "mere conversation," involving no restraint on the citizen's liberty. Such a noncoercive encounter is not a "seizure" under Article I, section 9, and therefore

does not require justification. *State v. Holmes*, 311 Or 400, 407, 813 P2d 28 (1991). Whether a particular encounter is free of coercion or interference with a citizen's liberty or, instead, is a "seizure" and therefore must be justified by reasonable suspicion of criminal activity or immediate threat to the officer depends on the totality of the circumstances of the encounter. *Id.* at 408. We now turn to that issue.

We begin with defendant's argument that she was seized unlawfully *before* Reynolds asked her what was in the bag because, if Reynolds had seized defendant in violation of her Article I, section 9, rights before he questioned her about the bag, then his questions about the bag also were unlawful, and the evidence that the state obtained as a result of those questions must be suppressed. *Bates*, 304 Or at 527 (court must suppress evidence obtained following search in violation of defendant's Article I, section 9, rights).

Defendant asserts that the critical events happened in the following sequence:[3] (1) Reynolds asked for and retained defendant's driver license; (2) the driver consented to a search of the van, and Reynolds asked defendant and the driver to exit the van so that he could conduct the search; (3) Reynolds encouraged defendant to leave her bag in the van; (4) Reynolds directed defendant and the driver to stand in front of the van, so that he could watch them while he searched; (5) Reynolds searched both the driver and defendant by looking in their coat pockets with a flashlight;[4] (6) Reynolds asked defendant for consent to search her bag, which she refused; (7) Reynolds asked defendant what was in the bag and whether there was anything in the bag that defendant did not want Reynolds to find, which led to defendant's response that she had a gun. Defendant also notes that the events took place at 1:00 a.m. and argues that she did not feel free to leave. Defendant claims that an impermissible

---

[3] Defendant does not argue that the initial stop of the van was unlawful.

[4] Defendant refers to that search variously as a "frisk," a "pat-down," or simply a "search," and we refer to it as a "pat-down search" to distinguish it from the search of the van and the later search of defendant's bag. At the suppression hearing, defendant testified that she didn't remember whether she was "pat searched," but did remember Reynolds shining a flashlight in her trench coat pockets. No party argues that Reynolds's action in checking defendant's pockets was not a "search."

"seizure" occurred no later than at point (5) in the sequence described above.

Defendant's position is problematic from the outset, because the sequence of events on which her argument rests is based only on her testimony and ignores both Reynolds's testimony and the trial court's findings, which, in some respects, are inconsistent with defendant's testimony. We base our review on the findings of the trial court, which we summarized above, and, to the extent that it depends on facts that go beyond the trial court's specific findings, we assume facts that are consistent with the trial court's ultimate conclusion that defendant had not been seized unlawfully. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). As we discuss below, defendant's arguments that she was seized without justification *before* Reynolds asked her about the contents of her bag fail, because they were not preserved or because they are based on factual claims that the trial court rejected.

■ First, defendant identifies the fact that Reynolds took her driver license as a critical factor that supports her assertion that he seized her unlawfully. As noted earlier, and contrary to the sequence of events outlined by defendant, the record does not establish when Reynolds took defendant's license or when he returned it. In any event, defendant failed to make any argument to the trial court that Reynolds stopped or seized her when he took her license. The Court of Appeals rejected her claim on that basis, *Amaya*, 176 Or App at 38, and we conclude that that reasoning applies to defendant's present argument as well.

■ Second, defendant argues that she was seized without reasonable suspicion when Reynolds conducted the patdown search of her coat. However, defendant made that argument for the first time in her petition for review. Defendant never argued to the trial court or to the Court of Appeals that she had been searched or seized unlawfully when Reynolds searched her pockets. Although she filed a generic motion to suppress, asserting that her statements and her weapon were obtained in violation of applicable statutes and constitutional provisions, the memorandum in support of her motion does not mention the patdown search. Similarly, in

her oral argument in support of the motion, defendant's counsel never referred to the patdown search. The memorandum and oral argument focused solely on whether Reynolds had been authorized to ask questions that went beyond the scope of the traffic stop. Before the Court of Appeals, defendant again phrased the legal issue as whether Reynolds's questioning about the contents of her bag had been unconstitutional because it had been unrelated to the purpose of the traffic stop.

■■ Although we reject the two arguments just discussed on preservation grounds, we recognize the problems that may arise if the preservation onion is sliced too thinly. Defendant notes that whether a person is "seized" for purposes of Article I, section 9, requires a "fact-specific inquiry into the totality of the circumstances of the particular case." *Holmes*, 311 Or at 408. We agree with defendant that the preservation requirement does not require a party to identify and assert a separate legal theory as to why each element in the "totality of circumstances" or each successive event in a sequence of events amounts to a "seizure." The purpose of the preservation rule is the practical one of requiring a defendant to provide an explanation of his or her position "specific enough to ensure that the [trial] court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction is warranted." *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000). Defendant's arguments that we have rejected on preservation grounds, however, are discrete legal theories as to specific actions of the officers, each of which allegedly constituted a seizure. They could, and should, have been raised below.

Finally, defendant suggests that Reynolds unlawfully seized her when, after the driver consented to a search of the van, Reynolds asked her and the driver to exit the van and stand nearby. Defendant testified that Reynolds had asked them to get out of the van and that, after Reynolds had searched the van, he had questioned her about the contents of her bag. Thus, according to defendant, when Reynolds asked what was in her bag, she already had been detained unlawfully. The trial court's findings, however, do not support defendant's version of the facts. The trial court apparently accepted Reynolds's testimony that he had questioned

defendant about her bag shortly after she had left the van and *before* he had searched the van, rather than defendant's testimony that the questioning had occurred after the search of the van. The trial court's recitation of the facts indicates that it concluded that, by the time that defendant had left the van—taking her bag with her, placing it between her legs, and hiding it with her coat—Reynolds reasonably suspected that defendant posed a threat to his safety. Accordingly, defendant's argument that she was seized at an identifiable point in time before Reynolds's questions about the bag— when she had been asked to exit the van and stand nearby— is properly viewed as one aspect of her claim that she was seized unlawfully by Reynolds's questioning. We consider that argument below.

As the foregoing summary demonstrates, defendant's arguments that she had been seized unlawfully before Reynolds had asked about her bag either are not preserved or must be considered as part of her argument about the questioning concerning her bag. We therefore turn to the issue that defendant argued in the trial court and the Court of Appeals: whether Reynolds's questioning of defendant about the contents of her bag constituted an unlawful seizure.

As we noted earlier, the Court of Appeals held that the questions did not amount to a seizure because the trial court had found that defendant had been free to leave and that the officers had imposed no restraint on her liberty. *Amaya*, 176 Or App at 44. Defendant argues that, under the standard articulated in *Holmes*, 311 Or at 409-10, she was seized for purposes of Article I, section 9, because she believed that the officers significantly had restricted her liberty and "such belief [was] objectively reasonable in the circumstances."

■    It is a truism that all passengers in a validly stopped car have been "stopped," at least physically. However, such a stop is not a "seizure" of those passengers for constitutional purposes. *See Holmes*, 311 Or at 410-12 (discussing circumstances in which police-citizen encounters are not "seizures"). It also is true that an officer may take reasonable steps

respecting the passengers, including, for example, asking the passengers to exit the vehicle so the officer may search the vehicle, assuming that the driver has consented to the search or that it otherwise is justified. However, an officer's further exercise of coercive authority over the passengers after they are out of the vehicle may, in certain circumstances, constitute a seizure. Here, defendant argues that Reynolds's questions to her after she exited the van about the contents of her bag constituted such a seizure.

■ We conclude, however, that it is unnecessary in this case to decide if defendant was "seized" by Reynolds's questioning. Even assuming that Reynolds's questions to defendant temporarily restrained her liberty and thus constituted a "seizure" of defendant, those questions were permissible under Article I, section 9, because they were based on Reynolds's reasonable suspicion that defendant posed an immediate threat of serious injury to him. Our conclusion in that regard is based on this court's prior decisions in *Bates* and *State v. Ehly*, 317 Or 66, 854 P2d 421 (1993).

As discussed above, *Bates*, like this case, involved a traffic stop. In the course of the stop, the officer observed one end of a bag on the floor of the car between the defendant's feet. The officer instructed the defendant to "cautiously pull that item from between his feet, so [the officer] could see what it was." 304 Or at 521. Eventually, the officer seized and searched the bag and found that it contained ammunition, drugs, and drug paraphernalia. Recognizing that police officers engaged in a lawful traffic stop are entitled to take steps reasonably necessary to ensure their safety, *id.* at 523, this court stated that Article I, section 9, required that those steps be supported by "a reasonable suspicion, based upon specific and articulable facts, that the citizen might pose an immediate threat of serious physical injury to the officer or to others then present." *Id.* at 524. This court further noted that, in reviewing an officer's conduct during a lawful traffic stop, the court's inquiry was "limited to whether the precautions taken were reasonable under the circumstances as they reasonably appeared at the time that the decision was made." *Id.* at 524-25.

Applying that constitutional test to the facts, this court in *Bates* concluded that the vehicle's out-of-state plates, the "high crime" area in which the stop occurred, and the presence of a VCR and a television in the car did not support the state's assertion that the officer reasonably suspected that the defendant "was armed and dangerous." Neither did the defendant's appearance—a self-described "Indian" with long hair and a beard—support a reasonable belief that the defendant was dangerous, nor did the defendant's behavior during the stop suggest that he was dangerous. Moreover, there had been no sign of a weapon in the car; the officer simply had seen what had appeared to be a bag on the floor. On those facts, this court held that the officer had not had a reasonable suspicion based on specific facts that the defendant had posed an immediate threat to him. Accordingly, the officer's questions and orders to the defendant regarding the bag, and the subsequent search and seizure of the bag, had violated the defendant's right under Article I, section 9, to be free from unreasonable searches and seizures.[5]

In contrast, in *State v. Ehly*, this court upheld a safety-related search, because the police officers reasonably had suspected that the person whom they were investigating had posed a serious threat of harm to them. The officers had been called to a motel room to confront the defendant, whom they knew to be a methamphetamine user and who appeared to be under the influence of methamphetamines. 317 Or at 69. The officers had just seen a man leaving the motel parking lot whom they knew to be a friend of the defendant and whom they thought possessed a handgun. *Id.* While the officers talked to the defendant, he began rummaging through a gym bag, with both hands concealed. *Id.* at 70-71. On those facts, this court held that the officers' decision to grab the gym bag and dump out its contents had been based on their reasonable suspicion that the defendant had been looking for a gun. *Id.* at 83.

---

[5]   *See also State v. Hoskinson*, 320 Or 83, 879 P2d 180 (1994) (search of wallet incident to lawful arrest for driving while suspended not justified, because officer had no reasonable suspicion that arrestee posed threat of harm to officer); *State v. Valdez*, 277 Or 621, 561 P2d 1006 (1977) (individual's "sharp" appearance and fact that individual was placing paper bag in car trunk in high crime area at 5:00 p.m. did not constitute reasonable suspicion that individual had committed crime).

Applying the standards articulated in *Bates* and *Ehly* to this case, we conclude that, based on the totality of the circumstances, Reynolds reasonably suspected that defendant posed an immediate threat to his safety. Reynolds testified that, when he first approached the stopped vehicle, he had noticed that defendant appeared nervous and was moving something around and putting something into a large purse-like bag at her feet. When defendant and the driver exited the van, Reynolds, concerned that defendant might have a weapon in the bag, encouraged her to leave the bag in the vehicle. Defendant, however, took the bag with her when she left the vehicle, placing the bag on the ground between her feet and attempting to conceal it with her coat. Reynolds thought that defendant was trying to hide the bag. Moreover, by keeping the bag close to her, defendant would have had easy access to any weapon in the bag, a fact that made Reynolds's stated concern for his safety more reasonable. Reynolds also testified that the stop had occurred at 1:00 a.m. in an area known for drug dealing and that he had been the only officer present at the time that he asked defendant what was in her bag. Reynolds testified that those facts had made him concerned for his safety and that he had suspected that defendant had a weapon or drugs in her bag.

Reynolds testified that he had based his suspicion that defendant had posed an immediate threat to his safety on the circumstances of the encounter and on specific and articulable facts regarding defendant's behavior. As noted previously, the trial court found that there had been "enough articulable suspicion here on the part of the officer * * * for him to be concerned about his safety," and the record supports the trial court's finding.

For the foregoing reasons, we hold that Reynolds's questions about the bag's contents were based on a reasonable suspicion that defendant posed an immediate threat of serious injury to him and therefore did not violate defendant's rights under Article I, section 9. Further, after defendant responded that she had a weapon in her bag and that she did not have a concealed weapon permit, the officers' subsequent search of the bag and seizure of the weapon were

supported by probable cause to believe that defendant had committed a crime.[6]

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.

---

[6] Defendant also argues that Reynolds's conduct violated her Fourth Amendment rights. The Court of Appeals rejected defendant's argument. *Amaya,* 176 Or App at 44-48. We, however, decline to address defendant's federal constitutional claim. Although defendant cited both the state and federal constitutions in her motion to suppress, her memorandum cited only state case law and never developed any separate federal constitutional analysis. Similarly, her brief in the Court of Appeals mentions the Fourth Amendment in passing, but relies solely on state cases and fails to develop any separate federal law argument. Defendant cited a single federal decision in a memorandum of additional authorities filed in the Court of Appeals. In those circumstances, we decline to consider defendant's Fourth Amendment argument. *See State v. McNeely,* 330 Or 457, 468, 8 P3d 212, *cert den,* 531 US 1055 (2000) (declining to consider claim supported by mere summary references to federal constitutional provisions).