No. 21          August 10, 2023          311

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON,
*Petitioner on Review,*

*v.*

LYNN EDWARD BENTON,
*Respondent on Review.*

(CC CR1201792) (CA A164057) (SC S069454)

On review from the Court of Appeals.*

Argued and submitted December 1, 2022.

Christopher A. Perdue, Assistant Attorney General, Salem, argued the cause and filed the briefs for respondent on review. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

David Sherbo-Huggins, Deputy Public Defender, Office of Public Defense Services, Salem, argued the cause and filed the brief for petitioner on review. Also on the brief was Ernest G. Lannet, Chief Deputy Defender.

Jessica A. Schuh, Schwabe, Williamson & Wyatt, P.C., Portland, filed the brief for *amici curiae* Criminal Justice Reform Clinic and Forensic Justice Project. Also on the brief were Aliza B. Kaplan, Lewis and Clark Law School Criminal Justice Reform Clinic, Portland, and Janis C. Puracal, Forensic Justice Project, Portland.

Before Flynn, Chief Justice, and Duncan, Garrett, and Bushong, Justices, and Balmer and Walters, Senior Judges, Justices pro tempore.**

_____

\* Appeal from Clackamas County Circuit Court, Kathie F. Steele, Judge. 317 Or App 384, 505 P3d 975 (2022).

\*\* Nelson, J., resigned February 25, 2023, and did not participate in the decision of this case. James, J., did not participate in the consideration or decision of this case.

BALMER, S. J.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded to the circuit court for further proceedings.

**BALMER, S. J.**

This case requires us to consider when a private citizen becomes a state agent for purposes of Article I, section 11, of the Oregon Constitution. While being held pending trial for aggravated murder, defendant lived in the same unit as another adult in custody, Layman. Layman hoped to be an informant for the state and to pass on information about defendant in exchange for a benefit in his own cases. Layman spoke with defendant about his case and learned incriminating information. Layman had a series of proffer meetings with the state, and he ultimately signed a cooperation agreement to testify against defendant. Before trial, defendant moved to suppress Layman's testimony. Defendant argued that Layman had acted as a state agent in questioning defendant, thereby violating defendant's right to counsel. The trial court denied defendant's motion to suppress, citing insufficient evidence that Layman had acted as a state agent. Layman testified against defendant at trial, and the jury convicted defendant of aggravated murder and other crimes.

The Court of Appeals reversed, holding that Layman had been acting as a state agent by the end of his second proffer meeting because, by that point, the state's involvement in Layman's questioning of defendant was sufficient to bring into effect the constitutional protections of Article I, section 11. *State v. Benton*, 317 Or App 384, 429, 505 P3d 975 (2022). For the reasons set out below, we agree: Defendant's admissions to Layman made after that second proffer meeting should have been excluded. The Court of Appeals decision is affirmed, and defendant's convictions on Counts 1, 2, 6, and 7 are reversed and remanded for a new trial.

## FACTS

"We take the relevant facts from the record and the Court of Appeals opinion, setting them out consistently with the trial court's explicit and implicit findings. We review the trial court's denial of defendant's motion to suppress for errors of law." *State v. Sines*, 359 Or 41, 44, 379 P3d 502 (2016) (citation omitted).

Defendant was indicted by a Clackamas County grand jury for aggravated murder, attempted murder, solicitation,

and conspiracy, based on evidence that he and two other people, Campbell and Jaynes, had killed defendant's wife, Debbie Lee Benton. Defendant was arrested and jailed in Multnomah County pending trial. From April to July 2015, another adult in custody, Layman, was housed in the same unit as defendant. Layman had pending cases in both Clackamas and Multnomah Counties. Layman and defendant worked together in the jail and were housed in adjacent cells where they could talk. Layman and defendant began to discuss defendant's case. Eventually, Layman learned from a deputy that defendant had been indicted for killing his wife.

In June 2015, Layman asked his attorney to tell the Clackamas County District Attorney that Layman had heard defendant make some incriminating statements. Layman hoped to benefit in his pending cases by sharing information about defendant with the state. In June and July 2015, Layman made three proffers of information gathered from conversations with defendant.

During Layman's first proffer meeting, on June 16, 2015, Layman and his attorneys met with two prosecutors, an investigator, and a detective. Layman signed a proffer agreement and read notes that he had taken about his conversations with defendant. The investigator, Schmautz, asked Layman some follow-up questions, including whether Layman had looked at any of defendant's discovery and whether defendant had said how his coconspirators had been involved. Near the end of the first meeting, Layman and Schmautz had the following exchange in which Schmautz admonished Layman that the state was not directing him to speak with defendant:

> "[Schmautz]: So, [Layman], just so you're clear, we do not want—we're not directing you or telling you to have any conversations with [defendant]. He's represented by attorneys, and we don't want you to think—
>
> "[Layman]: Right.
>
> "[Schmautz]: —the fact that you're talking to us that we would in any way direct you, or tell you to have any conversations with him.
>
> "[Layman]: All right."

No agreement was made between Layman and the state concerning any benefit to Layman at that time. Schmautz stated that Layman could reach out if he thought that he had any other helpful information. None of the prosecutors or police directed Layman to stop discussing defendant's case with defendant.

Layman continued his conversations with defendant after that meeting. Layman did not just passively listen, but sometimes prompted defendant to talk about his case. Layman learned more about the case, including about defendant's trial strategy, the details of the murder, and the roles of defendant's coconspirators, Campbell and Jaynes.

Layman met with the prosecutors a second time, on July 2, 2015, to discuss the possibility of a cooperation agreement regarding the information Layman had already offered. When the parties could not agree, Layman offered additional information and answered more questions from Schmautz. Schmautz's questions focused on specific facts, including when defendant had gotten a call from one of his coconspirators, how defendant had harmed the victim, and what Campbell and Jaynes had done. Layman did not have answers to those questions. Schmautz reiterated to Layman that the state was not directing him to have any communications with defendant. The July 2 proffer meeting is discussed in further detail below.

Layman contacted the district attorney again, indicating that he had more information, and a third meeting took place on July 30, 2015. Layman reported to the prosecutors that he had been able to ask defendant specific questions about the crime, and Layman related to them additional incriminating statements that defendant had made, including his motive for the crime and details about the murder weapon.

Following that meeting, extended negotiations took place between Layman and the state. Layman ultimately entered into a cooperation agreement with the district attorney on January 16, 2016, whereby Layman agreed to testify against defendant in exchange for favorable sentencing recommendations from the district attorney in his pending Multnomah County case.

Before trial, defendant moved to exclude Layman's testimony regarding defendant's statements, as well as any derivative evidence. Defendant argued that Layman had acted as the state's agent in questioning defendant without counsel, in violation of Article I, section 11, of the Oregon Constitution.[1] The trial court denied defendant's motion because it found that there was insufficient evidence to conclude that Layman had been acting as the state's agent.

At defendant's trial, Layman testified against defendant pursuant to his cooperation agreement with the state. Layman testified to various incriminating statements made by defendant involving his solicitation of Campbell and Jaynes to murder his wife, details of the plan the three conspirators had formed, defendant's motive for wanting the victim dead, and defendant's participation in the murder. Due in part to noncooperation by other witnesses (including Campbell, whom the state had hoped would testify), the state's case at trial was based largely on Layman's testimony.

The jury found defendant guilty of two counts of aggravated murder and two counts of conspiracy, which merged into a single conviction of aggravated murder. The jury also found defendant guilty of attempted murder by a nonunanimous verdict, but that count was dismissed on defendant's post-judgment motion.

---

[1] Along with Article I, section 11, defendant argued in the trial court that Layman's questioning of him violated Article I, section 12, which provides, "No person shall be put in jeopardy twice for the same offence [*sic*], nor be compelled in any criminal prosecution to testify against himself." Defendant raises that argument on review as well. On appeal, however, defendant did not make a separate argument under that section, so the Court of Appeals only addressed Article I, section 11. *Benton*, 317 Or App at 421 n 3. Defendant does not explain why that ruling by the Court of Appeals was in error, so we limit our review to Article I, section 11, as well. *See State v. Snyder*, 337 Or 410, 422 n 8, 97 P3d 1181 (2004) (declining to consider argument that was not raised before or addressed by the Court of Appeals); *State v. Amaya*, 336 Or 616, 634 n 6, 89 P3d 1163 (2004) (declining to consider constitutional argument that was mentioned only in passing and not separately developed in the party's Court of Appeals brief).

Defendant also raised federal constitutional arguments in the trial court and on appeal. Defendant did not raise those arguments in his petition for review, however, and we do not reach them because we affirm the Court of Appeals based on state law. *See* ORAP 9.20(2); *State v. Weaver*, 367 Or 1, 21, 472 P3d 717 (2020) (explaining that this court ordinarily considers state constitutional issues before federal claims under the "first things first" methodology).

Defendant appealed, arguing that the trial court had erred in denying his motion to suppress Layman's testimony, among other errors. Defendant contended that Layman had been acting as a state agent in questioning defendant. Defendant proposed four different dates when Layman could be deemed to have become a state agent, which were the date of Layman's first conversation with defendant, the date of Layman's first proffer meeting, the date of Layman's second proffer meeting, and another later date. Defendant identified certain facts relevant to each of the proposed dates. As to the first date, for example, defendant noted that Layman had been actively working as an informant on a different matter when he first met defendant. As to the later dates, defendant argued that the state had encouraged Layman's conduct by having several high-ranking members of the prosecution team meet with Layman; the prosecution team had implied through specific questioning the topics that were of interest to them; and the team had indicated an openness to receiving additional information regarding defendant from Layman.

The state responded that Layman was not an agent of the state when he was questioning defendant. The state emphasized that state officials had warned Layman that the state was not asking him to question defendant, that they had not encouraged Layman to meet with defendant or suggest topics for Layman to explore, and that they had not come to a cooperation agreement until long after the incriminating statements were made.

The Court of Appeals reversed in part, concluding that Layman had become a state agent on July 2, 2015, the date of Layman's second proffer meeting. *Benton*, 317 Or App at 429. The court relied on *Sines*, 359 Or 41, which addressed when a private citizen becomes a "police agent" in the context of private-citizen searches and Article I, section 9. *Benton*, 317 Or App at 423-24. The Court of Appeals explained that *Sines* relied on common-law agency principles and focused on "'objective manifestations by the principal to the agent that the agent should or may act on behalf of the principal.'" *Id.* at 424 (quoting *Sines*, 359 Or at 60).

In this case, the Court of Appeals observed, there were few or no such "objective manifestations" surrounding the first proffer meeting, during which there was no discussion of a deal for information, and during which Schmautz admonished Layman that the state was not directing him to ask defendant any questions. *Id.* at 425-26.

As to the second proffer meeting, however, the Court of Appeals concluded that there were sufficient "objective manifestations" to trigger the exclusionary rule for statements that defendant had made to Layman after that meeting. *Id.* at 427-28. The Court of Appeals noted that the second proffer meeting had begun as negotiations to give Layman a benefit in return for his testimony, that Layman had shifted his approach in questioning defendant and had changed his questioning to focus on topics that the state was interested in, and that no one from the state had told Layman to cease his inquiries of defendant. *Id.* at 426. Schmautz had again asked questions of Layman that focused on areas of particular interest to the prosecution. The court determined that, by assenting to and implicitly guiding Layman's investigation, securing his presence for in-person negotiations to obtain his testimony against defendant, and not attempting to discourage that investigation, the state had entered an agency relationship with Layman, triggering the state constitutional exclusionary protections. *Id.* at 427-28. Accordingly, the court concluded that defendant's statements after the second proffer meeting should have been excluded. The court further held that the error had not been harmless, and it reversed defendant's corresponding convictions and remanded for further proceedings. *Id.* at 429.

The state petitioned for review, which we allowed.

## ANALYSIS

The question presented is whether Layman became a state agent for purposes of Article I, section 11, of the Oregon Constitution, and if he did, when that happened. On review, the state argues that *all* of Layman's testimony about his conversations with defendant is admissible because he was never acting as an agent for the state

when questioning defendant. Defendant takes the position that *none* of Layman's testimony is admissible, including the information that he provided at the first proffer meeting, because Layman was acting as a state agent from the beginning. The Court of Appeals rejected both of those positions and instead concluded that Layman began acting as a state agent after his second proffer meeting with the state. *Id.* The Court of Appeals held that defendant's statements to Layman after July 2, 2015, should have been suppressed, while defendant's earlier statements were properly admitted. *Id.*

Article I, section 11, provides, "In all criminal prosecutions, the accused shall have the right *** to be heard by himself and counsel." The Article I, section 11, right to counsel is an individual right that allows the person to rely on counsel to protect their rights when the state exercises its prosecutorial powers against the person. *State v. Craigen*, 370 Or 696, 705, 524 P3d 85 (2023); *see id.* at 704-06 (explaining the importance of Article I, section 11). "After a defendant has been charged with a crime and the right to counsel has attached, Article I, section 11, *** prohibits the police from asking the defendant about that crime without first notifying his or her lawyer." *State v. Prieto-Rubio*, 359 Or 16, 18, 376 P3d 255 (2016).

The right to counsel applies to certain pretrial events, including interrogations. *Craigen*, 370 Or at 706. In the pretrial context, the purpose of the right to counsel is "to ensure that a defendant charged with a crime has the benefit of an attorney's presence, advice, and expertise in any situation where the state may glean involuntary and incriminating evidence or statements for use in the prosecution of its case against [the] defendant." *Prieto-Rubio*, 359 Or at 36 (internal quotation marks and emphasis omitted). The remedy for a violation of Article I, section 11, is "the exclusion of any prejudicial evidence obtained as a result of that violation." *Id.* at 38.

For those reasons, the Article I, section 11, protection against police interrogation of a defendant in the absence of counsel—and the exclusion of evidence derived from such an interrogation—can apply not only when the

interrogation is conducted directly by the police, but also when the questioning is by a private citizen acting as an agent of the police.[2] The exclusionary rule does not apply to questioning by every private citizen who offers information to the police, but only to those who are acting on behalf of the state when they gather information. This court has explained that whether an informant is acting on behalf of the state when questioning a defendant depends on whether the police are "'directly or indirectly involved to a sufficient extent in initiating, planning, controlling or supporting the informant's activities'" to render the informant a state agent. *State v. Smith*, 310 Or 1, 13, 791 P2d 836 (1990) (quoting *State v. Lowry*, 37 Or App 641, 651-52, 588 P2d 623 (1978), *rev den*, 285 Or 195 (1979)) (brackets omitted) (the "*Smith* test"). In applying the *Smith* test, this court has examined several factors, including, among others, whether there was an agreement between the informant and the state; whether the state actively instructed, encouraged, or discouraged the informant; and what motive led the informant to gather evidence. *See id.* at 13-14; *State v. Acremant*, 338 Or 302, 329, 108 P3d 1139, *cert den*, 546 US 864 (2005); *State v. McNeely*, 330 Or 457, 461, 8 P3d 212, *cert den*, 531 US 1055 (2000).

This court's recent application of the *Smith* test in *Sines* provides additional guidance. The parties here dispute the significance of *Sines*, and, before considering the facts of this case, we are presented with the preliminary question of whether *Sines*, an Article I, section 9, case, modified the *Smith* test for purposes of Article I, section 11. As explained below, *Sines* helps clarify the test that we ultimately apply in this case, but it did not replace the *Smith* test.[3]

---

[2] We use the word "agent" here because we have used it in *State v. Smith*, 310 Or 1, 791 P2d 836 (1990), and other cases involving the relationship between police and nonpolice informants. As we explain in greater detail below, in this context the term is not necessarily limited to persons who would be considered "agents" under the common law of agency.

[3] Although *Sines* was a "search" case under Article I, section 9, and *Smith* was a "right to counsel" case under Article I, section 11, our decision in *Sines* makes it clear that we found that the analysis of permissible (and impermissible) police involvement in investigative activity by private citizens under those provisions to overlap in important ways. We do not, however, conclude that those two constitutional provisions will necessarily be interpreted in the same way in other factual settings.

*Sines* involved an informant who was not in custody and had not been charged with any crime. The informant was instead the defendant's housekeeper, who called the Oregon Department of Human Services and reported that she suspected the defendant of sexually abusing his daughter. 359 Or at 45. The housekeeper had grown suspicious after seeing an unusual discharge on the daughter's underwear. The state employee who answered the housekeeper's call told her that the state could test the underwear if they had it, and he gave the housekeeper his direct phone number. The state employee also advised the housekeeper that he could not instruct her to take the underwear. After that, law enforcement delayed a planned safety check of the defendant's house (without telling the housekeeper) to give the housekeeper more time to retrieve an underwear sample for testing. *Id.* at 46. The housekeeper retrieved the underwear sample and submitted it to the state, and testing revealed the defendant's semen on the garment. The state subsequently charged defendant with various crimes related to that discovery.

Before trial, the defendant moved to suppress the evidence obtained through the housekeeper's conduct on the ground that she had acted as a state agent and without a warrant, in violation of the Article I, section 9, protection against unreasonable searches. *Id.* at 47. The trial court denied the defendant's motion to suppress, and this court affirmed. In explaining our decision, we cited the *Smith* test, but we also noted that common-law agency principles "can provide substantial assistance" in determining when a private citizen becomes an agent of the state. *Id.* at 55. The court emphasized the "objective statements and conduct of the parties" in evaluating whether an agency relationship had formed, rather than on the "subjective motives of the principal and agent, or on what the principal 'knew' or 'thought' that the agent might do." *Id.* at 55-56. The court ultimately considered "whether the state's conduct would have conveyed to [the housekeeper] that she was * * * authorized" to take the underwear sample, and the court concluded that it could not have. *Id.* at 62. The court therefore held that the trial court had correctly denied the defendant's motion to suppress.

In this case, the state argues that *Sines* effectively modified or replaced the *Smith* test with a common-law agency test. The state would have us hold that a private actor becomes a state agent for purposes of Article I, section 11, "if a reasonable person would conclude that the state authorized the person to elicit incriminating information from [a] defendant on the state's behalf." The state would further have us hold that an informant's subjective expectation of a reward does not render a private citizen a state agent, nor does the state's failure to affirmatively discourage further investigation. In applying that test, the state argues that we should focus on the nature of any agreement between the state and the informant, the state's instructions or assistance to the informant, and whether the state offered a benefit to the informant in exchange for specific information.

Defendant, on the other hand, argues that *Sines* did not abrogate the *Smith* test, and that *Sines* only held that agency principles can be *helpful*, not controlling, in determining whether an informant was acting on behalf of the state. Defendant would have us hold that suppression is required if the state's conduct was "reasonably likely" to lead a citizen to acquire evidence for the state.

Neither party's position is entirely consistent with the law set out in *Smith* and *Sines*. The state, for its part, reads too much into our application of agency principles in *Sines*. We observed in that case that common-law agency principles "can provide substantial assistance" in evaluating whether a private citizen had acted on behalf of the state. *Id.* at 55. Common-law agency principles were helpful, we explained, because the factual considerations underlying those principles emphasize the "objective statements and conduct" of the informant and the state. *Id.* A key advantage of the agency approach was its emphasis on manifestations that can be assessed objectively, in contrast to approaches that focus on the subjective motives and understandings of the putative principal and agent.

*Sines* did not, however, hold that only a true common-law agency relationship can trigger constitutional

protections in any case involving a private-citizen informant. Rather, in holding that the court looks primarily to the objective conduct of the parties to evaluate whether that conduct "communicated to the [informants] that they were authorized to act as agents of the state," *id.* at 59, *Sines* simply recognized that agency principles can be helpful in evaluating that conduct. *Sines* further made clear that failing to warn or advise an informant to refrain from specific conduct, although likely relevant, is not dispositive in determining whether an informant was acting on behalf of the state. *Id.* at 62. *Sines* is consistent with *Smith* and was itself an example of how the *Smith* test can be applied. Thus, although we agree with the state that the appropriate focus is on the objective manifestations of the state and the informant, we disagree that *Sines* requires that, in every instance, those manifestations must be sufficient to satisfy common-law agency requirements before Article I, section 11, will apply.

Defendant's proposed rule also misses the mark. Defendant suggests that an informant can become a state agent whenever the state's conduct is "reasonably likely" to cause the informant to gather information. That rule is far too broad. The commonly known fact that the state sometimes gives a benefit in exchange for incriminating information might well, by itself, be reasonably likely to cause some individuals to gather such information. As explained below, Oregon case law has already established that the mere practice of using information from jailhouse informants or other private citizens—even when the individual providing the information may receive a financial award or some other *quid pro quo*—does not render every private citizen who provides such information an agent of the state. The most helpful case in that regard is *Lowry*, decided by the Court of Appeals in 1978. Although *Lowry* is a Court of Appeals case and therefore does not bind this court, *see State ex rel Young v. Crookham*, 290 Or 61, 70, 618 P2d 1268 (1980), this court expressly adopted *Lowry*'s rule in *Smith*, so it is helpful to understand the facts of *Lowry*.

*Lowry* involved an informant named Reed, who was a "dedicated and accomplished 'stool pigeon'" and had substantial experience working as an informant for the state.

37 Or App at 643. The police initially discouraged Reed from gathering information about the defendant. *Id.* at 646. Despite that discouragement, Reed continued to question the defendant in the hope that he could earn a benefit from the state. That hope was well founded: After Reed passed on more information about the defendant, the police changed tack, actively encouraged Reed to question the defendant, and ultimately made a cooperation agreement with Reed. *Id.* at 647-49. The defendant was convicted, and, on appeal, the Court of Appeals held that Reed's questioning did not violate the defendant's constitutional rights until the police actively encouraged Reed to continue questioning the defendant. *Id.* at 655-56. The fact that the police had previously worked with Reed on other cases did not alone render Reed a state agent, even though that prior conduct made it reasonably likely that Reed would question other defendants. *Id.* at 653.

Neither of the positions articulated by the state and defendant are consistent with what existing case law has already said about the proper analysis for whether a private citizen has acted on behalf of the state for purposes of Article I, section 11. As the Court of Appeals noted in *Lowry*, there is no "hard and fast rule" for determining whether state involvement has been sufficient to trigger the exclusionary rule, and "[e]ach case must be evaluated on its own facts." 37 Or App at 652. There is no single metric for evaluating the sufficiency of the state's involvement. Accordingly, in conducting that evaluation, this court has phrased the inquiry a few different ways. For example, this court has queried whether the police were "'directly or indirectly involved to a sufficient extent in initiating, planning, controlling or supporting'" the informant's activities, *Smith*, 310 Or at 13 (quoting *Lowry*, 37 Or App at 651-52); whether the police had "sufficient involvement in controlling and directing" the informant's activities, *Acremant*, 338 Or at 329; whether the state had "provided such affirmative encouragement and authorization," *Sines*, 359 Or at 62; or whether there was sufficient "state instigation or direction," *id.* at 61, such that the conduct of the informant "should be attributed to the government," *id.* at 55. This court has also noted that, in cases where agency principles are helpful, the

emphasis is on whether the state's objective, observable conduct would communicate to the informant that they were acting on the state's behalf. *Id.* at 55-56. In the end, although the precise nature of the state's involvement may vary from case to case, the ultimate inquiry is whether the state was involved enough in guiding, encouraging, or supporting the informant's activities that the informant's conduct is fairly attributable to the state. The existing case law gives helpful benchmarks for determining the relevance of different considerations and for guiding the analysis in this case and future cases.

For example, existing case law indicates that an informant's subjective motivation for gathering information may be relevant, but it is generally insufficient by itself to determine whether an informant acted on the state's behalf. In *Acremant*, for example, this court considered the fact that the informant had acted primarily from his own personal desire to aid the police. 338 Or at 329. More importantly, however, after the defendant refused to answer the informant's questions, the police did not instruct the informant to continue questioning the defendant. And there was not enough other evidence that the police had controlled or directed the informant's actions, so the court concluded the informant was not acting as a state agent. *Id.* On the other hand, the informant in *McNeely* had gathered information in the hope of gaining a benefit from the state rather than out of a personal desire to aid the police. 330 Or at 460. Yet, because the state did not initiate, plan, control, or support the informant's activities, the court held that the informant's subjective motivation did not render him a state agent. *Id.* at 461.

We also observe that failing to discourage a private citizen from gathering information is not alone sufficient to render that citizen a state agent or to trigger the exclusionary rule. *Sines,* 359 Or at 62; *see also Coolidge v. New Hampshire*, 403 US 443, 488, 91 S Ct 2022, 29 L Ed 2d 564 (1971) (describing a similar rule under the Fourth Amendment). That said, active discouragement or, conversely, the failure to discourage, is likely relevant to the court's broad inquiry into the parties' conduct. When the parties' conduct indicates that the informant might be authorized

to act on the state's behalf, sufficient discouragement might negate the inference that the informant was so authorized and result in a conclusion that there was no agency relationship. In *Lowry*, for example, the informant had previously worked with the state and expressed interest in exchanging incriminating information about the defendant for money from the state. 37 Or App at 643-44, 646. The state likewise expressed interest in learning more about the defendant. *Id.* at 647. There was no formal agreement made at that point; at the same time, the Court of Appeals noted, the police "did nothing to discourage [Reed] from interrogating defendant further." *Id.* at 655. The Court of Appeals concluded that the state's actions had encouraged Reed to get information from defendant, triggering Article I, section 11, protections. *Id.* at 655-56. Thus, although the lack of discouragement in that case was relevant, it was not itself sufficient to render Reed a state agent.

With that background, we are tasked with applying *Smith*, *Sines*, and the other existing case law, to determine whether, and, if so, when, Layman acted as a state agent with regard to defendant, necessitating the exclusion of defendant's admissions to Layman. We proceed chronologically, beginning with Layman's initial questioning of defendant and then moving on to Layman's proffer meetings with the state.

First, we consider whether Layman was acting as a state agent from the moment he began questioning defendant. At that time, the state officials did not know that Layman had been questioning defendant. Layman had cooperated with the state in the past and knew that the state sometimes exchanged benefits for incriminating information, but Layman had not had any communications with the state regarding defendant. Defendant argues that Layman was acting as a state agent because the state's "practice of compensating inmates for eliciting statements from represented inmates" made it "reasonably likely" to induce Layman to question defendant.

Defendant's position that Layman was a state agent from the beginning is inconsistent with the existing case

law discussed above. As we have just explained, the Court of Appeals held in *Lowry*, and this court reaffirmed in *McNeely*, that the state's practice of sometimes rewarding informants for their cooperation does not, by itself, render every potential informant a state agent, even when the individual informant has a history of collaborating with the state. *Lowry*, 37 Or App at 653; *McNeely*, 330 Or at 460-61. At the same time, we do not discount the relevance of the state's practice of rewarding informants to our evaluation of the overall sufficiency of the state's involvement in informants' conduct. For example, the amount of involvement necessary to trigger the exclusionary rule might differ between informants who are in custody and may reasonably anticipate the possibility of a reward related to their pending cases, such as the informant here, and those who have no pending cases, such as the informant in *Sines*. Without more, however, the state's practice of sometimes rewarding informants does not, by itself, render every adult in custody a state agent, and it did not render Layman a state agent here. The Court of Appeals "readily conclude[d]" that Layman was not acting as a state agent from the beginning, *Benton*, 317 Or App at 425, and we agree.

We next consider whether Layman was acting as a state agent after his first proffer meeting with the state on June 16, 2015. At that meeting, which was held at Layman's request, Layman started by reading notes that he had taken of his conversations with defendant. The state recorded the proffer on video, asked questions about the dates of the conversations between Layman and defendant, and asked what Layman knew about Campbell and Jaynes, among other things. Layman asked for compensation or some other benefit for the information he had provided, but the state did not give Layman a reward at that time or promise a reward for further information. Near the end of the meeting, Schmautz admonished Layman that the state was not directing him to have any further conversations with defendant. Schmautz also told Layman, however, that he could reach out if he had any further information, saying, "So if there's anything that you remember that * * * you think that we do need to know to make an informed decision, will you tell one of your attorneys, and they can contact the prosecutor."

Viewed objectively, the state's conduct in that proffer meeting indicated, at most, that the state was interested in information about defendant. The state's conduct did not indicate that the state was prepared to offer Layman a benefit in exchange for further information, nor did the state encourage Layman to question defendant. The state's questions hinted at the type and quality of the desired information—namely, dated records of admissions regarding defendant, Campbell, and Jaynes's participation in the murder. Those hints did little more, however, than express the state's general interest in information about defendant and the crimes that he had been charged with. Schmautz's admonishment that "we're not directing you or telling you to have any conversations with [defendant]" reinforced the message that the state was not asking Layman to conduct any questioning on its behalf. Schmautz's statement that Layman could reach out with additional information conveyed some continuing interest, but it did not communicate that the state wanted Layman to gather additional information through further questioning. *Cf. Lowry*, 37 Or App at 653 (observing that a detective's statement that the police "would be appreciative for any information concerning any crime that [the informant] knew about" was insufficient, without more, to render the informant a state agent). In sum, the prosecution's statements and actions during the first proffer meeting, viewed objectively, did not at that point sufficiently guide, encourage, or support Layman's interactions with defendant to attribute that conduct to the state. We agree with the Court of Appeals that Layman did not become a state agent at the first proffer meeting.

Layman met with the state again about two weeks later, on July 2, 2015. The second meeting was markedly different from the first. The second meeting began as a negotiation to give Layman a benefit in return for his testimony against defendant. The trial court found that the state "didn't believe this was to be anything other than a discussion regarding the cooperation agreement." Going into that meeting, Layman was hoping that he could get a "significant time cut" from a sentence in one of his pending cases in exchange for testifying against defendant. The state did not agree to seek that reduction, but it did offer to try to

have Layman's Clackamas County sentence run concurrent with his Multnomah County sentence. Layman viewed that offer as inadequate and a "slap in the face," and it became clear that Layman and the state were unlikely to come to an agreement at that meeting.

Before the meeting was over, however, Layman said that he had more information to share. The state began audio-recording the meeting. Schmautz asked if Layman was "willing to share" that additional information, and Layman agreed.

As in the first meeting, Layman began by reading from notes of his conversations with defendant. After Layman had finished, Schmautz asked him follow-up questions on specific topics, such as defendant's coordination with Campbell ("[D]id [defendant] tell you where he was when he got the phone call from [Campbell]? *** Did he tell you *** where he was or what *** he was doing?") and defendant's participation in the murder ("Did he tell you specifically how he physically *** harmed Debbie?"). Schmautz asked twice about Jaynes and whether defendant had mentioned him ("Did he *** say what [Jaynes] was doing during this time? *** [H]as he mentioned [Jaynes] at all?"). Layman did not have detailed, substantive responses to those questions at that time. He said that he did not know the relevant details of defendant's coordination with Campbell, did not know whether or how defendant had physically harmed the victim, and did not know any details about Jaynes. Schmautz also asked whether Layman was still housed in the same place as defendant, and Layman said they were in adjacent cells. Layman indicated that, some of the time, he had initiated conversations with defendant about defendant's case, instead of just passively receiving information. The state did not tell Layman to stop questioning defendant, although Schmautz did reiterate his prior admonition to Layman that the state was "not directing [him] to have any communication *** with [defendant] at all."

By the end of the second proffer meeting, the state had made several "objective manifestations" of assent to and approval of Layman's activities. *Sines*, 359 Or at 60. The meeting had begun as a negotiation for Layman's testimony,

which objectively indicated that the state was willing to provide a reward to Layman—if he had enough information to offer. When the state learned that Layman had continued questioning defendant, the state did not discourage Layman from questioning further. The state asked specific, pointed, follow-up questions that, viewed objectively, could have telegraphed to Layman the topics that were of special interest to the state.

The state's conduct in the second proffer meeting indicated that the state was highly interested in additional, specific information regarding the murder defendant was charged with, and that it was prepared to offer Layman a concrete benefit in exchange if he could gather more (and more detailed) information. It was also reasonable to understand that the state was especially interested in the topics that Schmautz had asked about, and that returning with additional information on those topics could lead to an agreement (which, in fact, it later did). Although the state never expressly or overtly directed Layman to continue questioning defendant, by the end of the second proffer meeting, the state's conduct had sufficiently encouraged Layman to continue questioning defendant, and had sufficiently guided that further questioning, that Layman's subsequent communications with defendant about his charges were attributable to the state.

The state argues that the level of police involvement in Layman's questioning was substantially lower than in cases like *Lowry*, where the state actively intervened in collaboration with the informant to facilitate the informant's continued questioning of the defendant. *Lowry*, 37 Or App at 655 (noting that the state's intervention had prevented the informant from being transferred away from the defendant, and that the state had detained the informant for a length of time that "made it possible for him to continue his interrogation"). But active, collaborative facilitation is not required to render an informant a state agent. Here, the combination of the state's offer of concrete benefits in exchange for Layman's testimony, its implicit messaging of the topics it was interested in over the course of several meetings, and the other indicia of the state's interest in Layman's information, was sufficient guidance and encouragement to render

Layman a state agent, even without additional support or facilitation of his questioning.

In short, the state's conduct up to and including the second proffer meeting, taken as a whole, objectively conveyed that Layman was authorized to continue questioning defendant, that he should direct his questioning to certain topics, and that he could expect that he could earn a reward in his own cases from the state if he learned enough information and agreed to testify. That conduct rendered Layman a state agent with respect to defendant. Layman's questioning after July 2, 2015, violated defendant's Article I, section 11, right to counsel, and the trial court erred in denying defendant's motion to suppress defendant's statements after that date. Neither party contends on review that that error was harmless. We reverse and remand defendant's convictions on Counts 1, 2, 6, and 7.

The decision of the Court of Appeals is affirmed. The judgment of the circuit court is affirmed in part and reversed in part, and the case is remanded to the circuit court for further proceedings.